1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

EXPERIENCE HENDRIX, L.L.C., a
Washington Limited Liability Company, and
AUTHENTIC HENDRIX, LLC, a
Washington Limited Liability Company,

               Plaintiffs,

v.

HENDRIXLICENSING.COM, LTD, dba
HENDRIX ARTWORK and
HENDRIXARTWORK.COM, a Nevada
Corporation, and ANDREW PITSICALIS
and CHRISTINE RUTH FLAHERTY,
husband and wife,

               Defendants.

No.  C09-285Z

ORDER

18

19

20

     THIS MATTER comes before the Court on Plaintiffs' Motion for Partial Summary
Judgment of Federal Trademark Infringement Claim, docket no. 43.  For the reasons stated in
this Order, the Court GRANTS the Motion.

21

**BACKGROUND**

22

     **A.**     <u>**Previous Litigation and Defendants' Marks**</u>

23

24

25

26

     Plaintiffs Experience Hendrix, LLC ("Experience Hendrix") and Authentic Hendrix,
LLC ("Authentic Hendrix") (collectively, "Plaintiffs") previously sued Electric Hendrix,
LLC in this Court for infringing Plaintiffs trademarks in the sale and advertising of vodka
and other merchandise.  <u>Experience Hendrix, LLC et al. v. Electric Hendrix, LLC et al.</u>,

ORDER - 1

1    C07-338Z.  In that case, this Court granted partial summary judgment in favor of Plaintiffs,

2    holding that Electric Hendrix's use of JIMI HENDRIX ELECTRIC, JIMI HENDRIX

3    ELECTRIC VODKA, HENDRIX ELECTRIC, and HENDRIX ELECTRIC VODKA, as

4    well as the Hendrix Electric "bust" design (collectively, the "Hendrix Electric Marks")

5    infringed Plaintiffs' incontestable trademarks.  Order (C07-338Z, docket no. 104).  As a

6    result, the Court entered a permanent injunction against Craig Dieffenbach, Electric Hendrix,

7    LLC, and related entities.  See Judgment and Permanent Injunction (C07-338Z, docket no.

8    127).

9        Hendrix Licensing.com, Ltd., dba Hendrix Artwork and HendrixArtwork.com,

10   ("Hendrix Licensing"); Andrew Pitsicalis; and Christine Ruth Flaherty (collectively,

11   "Defendants") do not deny that Mr. Pitsicalis was formerly associated with Craig

12   Dieffenbach and Electric Hendrix, LLC, as National Licensing Director for House of

13   Hendrix.  See John D. Wilson Decl., docket no. 46, ¶ 2, Ex. 1 (Pitsicalis Business Card).  In

14   2008, Mr. Pitsicalis formed an entity known as HendrixLicensing.com LTD, which markets

15   posters, fine art prints, apparel (including T-shirts), dart boards, pool cues, "pub" glasses,

16   lamps, and other novelty items bearing the name and/or signature of, the likeness of, and/or

17   art created by Jimi Hendrix.  Wilson Decl., Ex. 8 (Pitsicalis Depo. (C09-285Z)); Willie Jinka

18   Decl., docket no. 9, Ex. 2 (Fig. 1, 2), Ex. 3 (Fig. 1, 2), Ex. 4 (Fig. 1), Ex. 7 (Fig. 1).

19   Mr. Pitsicalis obtained the rights to Mr. Dieffenbach's non-spirits intellectual property.

20   Wilson Decl., Ex. 3, at HEN 001201 (Agreement for Sale of Dieffenbach Non-Spirits

21   Intellectual Property).  Mr. Pitsicalis was aware of the previous suit involving the Hendrix

22   Electric Marks, and he knew about the Permanent Injunctions issued in October 2008 and

23   February 2009.  Id., Ex. 13 (Lagomarsino Letter), at TANAKA 0039.  Mr. Pitsicalis talked

24   with Mr. Dieffenbach about the Electric Hendrix lawsuit, and Mr. Pitsicalis was deposed in

25   the Electric Hendrix lawsuit.  Id., Ex. 4 (Pitsicalis Depo. (C07-338Z)), at 53.

26

1    **B.    Plaintiffs' Marks**

2    Plaintiffs offer a variety of goods and services both directly and through licensees

3    under the marks JIMI HENDRIX, HENDRIX, the JIMI HENDRIX Signature Mark, the Bust

4    Logo, EXPERIENCE HENDRIX, AUTHENTIC HENDRIX, and variations and

5    combinations thereof (collectively, "Plaintiffs' Marks").  Janie Hendrix Decl., docket no. 8,

6    ¶ 7.  A certificate of registration of a mark upon the principal register is prima facie evidence

7    of the validity of the registered mark and of the registration of the mark, of the registrant's

8    ownership of the mark, and of the registrant's exclusive right to use the registered mark in

9    commerce or in connection with the goods or services specified in the certificate, subject to

10   any conditions or limitations stated in the certificate.  15 U.S.C. § 1057(b).  Because

11   Plaintiffs have registered their marks with the U.S. Patent and Trademark Office, Plaintiffs

12   marks are presumed valid and enforceable.  <u>See</u> Wilson Decl., Ex. 6 (Certificates of

13   Registration).

14   Plaintiffs' registered trademarks include the following marks that have become

15   incontestable (collectively, the "Incontestable Marks"):

16       (1)    AUTHENTIC HENDRIX, registration no. 2,245,408, for online
                ordering services of music, apparel, and memorabilia related to the
17              music industry;
         (2)    EXPERIENCE HENDRIX, registration no. 2,245,409, for print
18              materials, such as magazines and posters regarding the music industry;
         (3)    The EXPERIENCE HENDRIX AND BUST LOGO (design)
19              ("Plaintiffs' Bust Logo"), registration no. 2,250,912, for use on musical
                sound recordings;
20       (4)    JIMI HENDRIX, registration no. 2,322,761, for use on clothing such as
                T-shirts, jackets, and caps; and
21       (5)    JIMI HENDRIX, registration no. 2,383,500, for use in entertainment
                services.[1]

22

23

24   _____

25   [1] Plaintiffs also claim that they have the following incontestable trademarks: (1) JIMI HENDRIX,
     registration no. 2,876,475, for compact discs, and (2) JIMI HENDRIX EXPERIENCE, registration
26   no. 2,876,479, for digital video discs, phonograph records, and compact discs.  However, Plaintiffs
     did not provide evidence of registration for these marks with Plaintiffs' motion for partial summary
     judgment.  <u>See</u> Wilson Decl., Ex. 6 (Certificates of Registration).

ORDER - 3

1   Wilson Decl., Ex. 6 (Certificates of Registration), 9 (Trademark Application/Registration

2   Status Report).

3        Plaintiffs' contestable marks, which have been registered for less than 5 years,

4   include:

5        (1)   variations of Plaintiffs' "Bust Logo" for use on a number of products,
              including ceramic tiles, key chains, afghans, printed matter, etc., <u>see,</u>
6              <u>e.g.,</u> registration no. 3,302,367;
        (2)   HENDRIX and JIMI HENDRIX on compact discs, stickers, key chains,
7              T-shirts, buttons, watches, wall clocks, to advertise entertainment
              services, etc., <u>see, e.g.,</u> registration no. 3,302,110; and

8

9

10       (3)   the JIMI HENDRIX signature mark,                        , registration
              no. 3,001,465, for use on printed matter, key chains, clothing, sports
11             bottles, and for entertainment services.

12  <u>Id.</u>, Ex. 6 (Certificates of Registration), 9 (Trademark Application/Registration Status

13  Report).

        This Court previously held that Plaintiffs' Incontestable Marks are strong marks.
14
    Order (C07-338Z, docket no. 104), at 17.  The Court stated:
15
        The Court holds that the name Jimi Hendrix is a famous name and that it has
16       acquired a secondary meaning.  Accordingly, the Court holds that the
        Plaintiffs' incontestable Hendrix-related marks are strong marks . . . .
17
        Additionally, the AUTHENTIC HENDRIX BUST [Plaintiffs' Bust Logo] is a
18       high-contrast black and white silhouette image with the word EXPERIENCE
        arched above the bust and the word HENDRIX below the bust.  The arbitrary
19       nature of this mark's features, such as text placement, artistic choices in image
        style, and overall feel also make this a strong mark even apart from the strength
20       of the secondary meaning associated with HENDRIX.

21  <u>Id.</u>

        **C.    <u>Plaintiffs' Motion for Partial Summary Judgment</u>**
22
        This Court entered an Order for Preliminary Injunction, docket no. 31, against
23
    Defendants on July 30, 2009.  Plaintiffs now move for partial summary judgment and argue
24
    that Defendants are infringing Plaintiffs' HENDRIX "family" of trademarks by:
25
        (1)   using the preliminarily enjoined business names "Hendrix Licensing,"
26             "HendrixLicensing.com," "Hendrix Artwork," and
              "HendrixArtwork.com";

1  (2)   using the preliminarily enjoined domain name
       www.hendrixlicensing.com;
2  (3)   using the preliminarily enjoined domain name
       www.hendrixartwork.com;
3  (4)   using Defendants' preliminarily enjoined guitar and "headshot/bust"
       logo ("Defendants' Headshot Logo"); and
4

5

6  

7

8  *Defendants' Headshot Logo*

9  (5)   using Defendants' preliminarily enjoined signature of Jimi Hendrix
       ("Defendant's Signature Mark").

10

11

12  

13

14  *Defendants' Signature Mark*

Plaintiffs seek to have Defendants permanently enjoined from using these marks.  Plaintiffs

reserve for trial their trademark claims regarding Defendants' uses of the marks JIMI

HENDRIX and HENDRIX and Defendants' defenses of nominative or fair use,[2] and their

claims on damages.

       Defendants argue that they have ceased using the domain names, as well as

Defendants' Headshot Logo, but Defendants do contest the infringing nature of all of

Defendants' marks, including the domain names, Defendants' Headshot Logo, and

Defendants' Signature mark.[3]  Defendants contend that they are making "fair use" of

_____

[2]In response to this partial motion for summary judgment Defendants have raised their defense of
nominative or fair use and this Order has addressed these issues.

[3] Plaintiffs argue that Defendants continue to use the HendrixLicensing.com and
HendrixArtwork.com domain names for email communication, Wilson Decl., Ex. 5, and that
Defendants' distributors and licensees continue to offer for sale products with Defendants' Signature
mark and Defendants' Headshot Logo mark, id., Ex. 7.

ORDER - 5

HENDRIX in the domain names.  In addition, Defendants contend that Defendants' marks are not likely to cause confusion with Plaintiffs' marks under AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979).

## DISCUSSION

### A.    Summary Judgment Standard

The Court must grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving party need not negate the opponent's claim, Celotex, 477 U.S. at 323; rather, the moving party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, Anderson, 477 U.S. at 249.

When a properly supported motion for summary judgment has been presented, the adverse party "may not rest upon the mere allegations or denials" of its pleadings.  Fed. R. Civ. P. 56(e).  The non-moving party must set forth "specific facts" demonstrating the existence of a genuine issue for trial.  Id.; Anderson, 477 U.S. at 256.  A party cannot create a genuine issue of fact by asserting "some metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Likewise, discrediting the testimony proffered by the moving party will not usually constitute a sufficient response to a motion for summary judgment.  Anderson, 477 U.S. at 256-57.

To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  Id. at 255, 257.  When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is

warranted.  See Miller v. Glenn Miller Prod., Inc., 454 F.3d 975, 932 (9th Cir. 2006); see also Beard v. Banks, 126 S. Ct. 2572, 2578 (2006) (quoting Celotex, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")).

To prevail on a trademark infringement claim, a trademark owner must prove that the alleged infringer used the mark at issue in commerce and in connection with the sale, distribution, or advertising of goods or services in connection with which such use "is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114.  Injunctive relief is the remedy of choice for trademark infringement cases and is the remedy provided by 15 U.S.C. § 1116(a).  Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir. 1988).  Broad injunctions are especially appropriate in cases where the infringing use is for a similar service.  Id. at 1181.  "Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena."  Brother Records, Inc. v. Jardine, 318 F.3d 900, 903 (9th Cir. 2003).

## B.   **Nominative Fair Use**

### 1.   **Standard**

This Court entered a preliminary injunction on July 30, 2009, enjoining Defendants from maintaining any domain name incorporating the names HENDRIX or JIMI HENDRIX.[4]  Prior to the Court's issuance of the preliminary injunction, Defendants maintained a website at the URL address www.hendrixartwork.com, Jinka Decl. ¶ 2, Ex. 1 (HendrixArtwork.com News and Events Timeline), and the URL address

---

[4] Defendants allege that Defendants have abandoned any use of the Hendrix based domain names. Response, docket no. 47, at 1.  Plaintiffs have, however, produced an email showing that Mr. Pitsicalis used his email address at hendrixartwork.com as recently as December 29, 2009, after the Court issued the preliminary injunction in this matter.  Wilson Decl., Ex. 5.

1  www.hendrixlicensing.com, Alfred E. Donohue Decl., docket no. 18.  Defendants operate

2  under the entity formed by Mr. Pitsicalis as HendrixLicensing.com, Ltd., dba Hendrix

3  Artwork and HendrixArtwork.com.  Wilson Decl., Ex. 8 (Pitsicalis Dep. (C09-285Z)), at

4  0041; Pitsicalis Decl., docket no. 13, at 1.

5          Defendants argue that their use of the name HENDRIX in their URL addresses and

6  business names constitutes a "nominative fair use."  Fair use falls into two categories:

7  "classic fair use" and "nominative fair use."  Cairns v. Franklin Mint Co., 292 F.3d 1139,

8  1150 (9th Cir. 2002).  Classic fair use occurs when a defendant uses a plaintiff's mark to

9  describe the defendant's own product.  Id.  In contrast, nominative fair use entails a

10  defendant's use of a plaintiff's mark to describe the plaintiff's product.  Id.  The type of fair

11  use at issue dictates which standard the Court should apply in assessing the likelihood of

12  confusion.  Id.  The nominative fair use test found in Cairns "*replaces*" the Sleekcraft

13  analysis.[5]  Id. at 1150 (emphasis in original); see also Mattel Inc. v. Walking Mountal Prods.,

14  353 F.3d 792, 810 n.19 (9th Cir. 2003) ("The nominative fair use test replaces the traditional

15  AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979), analysis." (citing

16  Cairns)). To prevail on a nominative fair use defense, a defendant must show (i) the

17  plaintiff's product or service is not readily identifiable without using the mark, (ii) the

18  defendant has used only so much of the mark as is reasonably necessary to identify the

19  plaintiff's product or service, and (iii) the defendant has done nothing, in conjunction with its

20  use of the mark, that would suggest endorsement by the plaintiff.  Cairns, 292 F.3d at 1151

21  (citing New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 308 (9th Cir. 1992)).

22  Nominative fair use analysis is appropriate whenever a defendant uses a plaintiff's mark to

23  describe the plaintiff's product, even if the defendant's ultimate goal is to describe its own

24  product.  Id.

25

26

---

[5] The Sleekcraft analysis will be discussed in Part C.

ORDER - 8

1    The Ninth Circuit case most directly on point with regard to Defendants' use of

2    HENDRIX in Defendants' domain and business names is <u>Playboy Enterprises, Inc. v.</u>

3    <u>Welles</u>, 279 F.3d 796 (9th Cir. 2002).  In <u>Welles</u>, Terri Welles' use of the title "Playboy

4    Playmate of the Year 1981," and her use of other trademarked terms on her website were at

5    issue.  <u>Id.</u> at 799.  Welles had been on the cover of Playboy magazine in 1981 and was

6    Playboy Playmate of the Year for 1981.  <u>Id.</u>  Welles' website contained a biographical

7    section that described Welles' selection as Playmate of the Year in 1981 and her years

8    modeling for Playboy Enterprises, Inc. ("PEI").  <u>Id.</u>  After PEI's suit against Welles began,

9    Welles included discussions of the suit against her and criticism of PEI on her website; she

10   also include a note disclaiming any association with PEI.  <u>Id.</u>

11   PEI complained of four uses of its trademarked terms on Welles' website: "(1) the

12   terms 'Playboy' and 'Playmate' in the metatags of the website; (2) the phrase 'Playmate of

13   the Year 1981' on the masthead of the website; (3) the phrases 'Playboy Playmate of the Year

14   1981' and 'Playmate of the Year 1981' on various banner ads, which may be transferred to

15   other websites; and (4) the repeated use of the abbreviation 'PMOY '81' as the watermark on

16   the pages of the website."  <u>Id.</u> at 800.  Applying the three part nominative fair use test, the

17   court concluded that, except for Welles' use of PEI's protected terms in the wallpaper of

18   Welles' website, Welles' uses of PEI's trademarks were permissible, nominative fair uses.

19   <u>Id.</u>

20   The <u>Welles</u> Court reasoned that PEI's product was PEI's trademarked title, "Playboy

21   Playmate of the Year."  <u>Id.</u> at 802.  The Ninth Circuit agreed with the district court that it

22   would be impractical and ineffectual in identifying Welles to the public if she were described

23   as the "nude model selected by Mr. Hefner's magazine as its number-one prototypical

24   woman for the year 1981."  <u>Id.</u>  Thus, the <u>Welles</u> Court concluded that no descriptive

25   substitute existed for PEI's trademarks in the context of Welles' headlines and banner

26   advertisements on her website.  <u>Id.</u>

1       Turning to the second prong of the nominative fair use analysis, the <u>Welles</u> Court held

2   that because Welles' banner advertisements and headlines used only the trademarked words,

3   and not the font or symbols associated with the trademarks, Welles used "only so much of

4   the mark or marks . . . as is reasonably necessary to identify the product or service." <u>Id.</u>

5   (citing <u>New Kids</u>, 971 F.2d at 308).

6       Finally, as to the third element of the nominative fair use standard, the <u>Welles</u> Court

7   was persuaded that Welles did nothing in connection with her use of PEI's marks in the

8   headlines and banners on her website to suggest sponsorship or endorsement by PEI. <u>Id.</u> at

9   803. The court noted that the marks were clearly used to describe the title Welles received

10  from PEI in 1981 and that the title helps to describe who Welles is. <u>Id.</u> The court noted that

11  "[i]t would be unreasonable to assume that the Chicago Bulls sponsored a website of Michael

12  Jordan's simply because his name appeared with the appellation 'former Chicago Bull.'" <u>Id.</u>

13  Similarly, it would be unreasonable to assume that PEI sponsors or endorses someone who

14  describes herself as a "Playboy Playmate of the Year in 1981." <u>Id.</u> The Court also noted that

15  Welles affirmatively disavowed any sponsorship or endorsement by PEI on her website. <u>Id.</u>

16  Thus, the <u>Welles</u> Court concluded that Welles' use of PEI's trademarked terms in the banner

17  ads and headlines of her website satisfied the nominative fair use test.[6]

18      The <u>Welles</u> Court held, however, that Welles' repeated use of the abbreviation

19  "PMOY '81," which stands for "Playmate of the Year 1981," on the background or

20

---

21  [6] The <u>Welles</u> Court also concluded that Welles' use of the PEI trademarks in the metatags of her
    website (which enabled Welles' site to be included in the search results for the terms "playboy" or
22  "playmate" in a search engine that uses metatags) constituted nominative fair use. <u>Id.</u> at 803. The
    Court noted again that Welles had no practical way of describing herself without using trademarked
23  terms, and that she had no practical way of describing the content of her website without referring to
    PEI's trademarks. <u>Id.</u> Thus, the court concluded that Welles' use of the trademarked terms in the
24  metatags of her website satisfied the first prong of the nominative fair use test. <u>Id.</u> The Court
    concluded that Welles' use of the metatags satisfied the second and third prongs of the nominative
25  fair use test as well. <u>Id.</u> at 804. Because Welles used only the trademarked names and because the
    metatags did not list the trademarked terms so repeatedly that Welles' site regularly appeared above
26  PEI's in searches for one of the trademarked terms, the metatags did not use more of PEI's marks as
    was reasonably necessary and the metatags did not suggest sponsorship or endorsement by PEI. <u>Id.</u>

1   wallpaper of her website failed the nominative fair use test. Id. The court noted that Welles'

2   picture did not appear before or after "PMOY '81." Id. In addition, the court concluded that

3   the depiction of "PMOY '81" is not necessary to describe Welles, but rather "Playboy

4   Playmate of the Year 1981" is adequate. Id. Because the term "PMOY '81" did not appear

5   to describe Welles when her picture did not appear before or after each "PMOY '81," the use

6   of the abbreviation failed the first prong of the nominative fair use test. Id. Thus, the court

7   remanded to the district court the question whether "PMOY" was a protected trademark of

8   PEI. Id. at 805.

9                    **2.    Defendants' URL Addresses and Business Names**

10      Defendants argue that Defendants' use of HENDRIX in their URL addresses and in

11  their business names is similar to Welles' use of "Playboy Playmate of the Year 1981" in the

12  headline and banner advertisements of her website and of "playboy" and "playmate" in the

13  metatags of her website. See id at 800. However, the Court concludes that Defendants' use

14  of Plaintiffs' mark[7] HENDRIX in Defendants' URL addresses and business names does not

15  constitute a nominative fair use.

16      The Court finds that Defendants' use of Plaintiffs' trademarked HENDRIX in

17  Defendants' URL addresses and business names does not describe Plaintiffs' product but

18  rather Defendants' own product–the marketing and licensing of Jimi Hendrix related goods.

19  See Cairns, 292 F.3d at 1150. Thus, the Court concludes that the nominative fair use test

20  does not apply to Defendants' use of Plaintiffs' marks in Defendants' URL addresses and

21  business names.[8]

22  _____

23  [7] Plaintiffs have multiple registered trademarks for the marks "HENDRIX," see, e.g., registration
    nos. 3,409,133 and 3,302,093, and "JIMI HENDRIX," see, e.g., registration nos. 2,989,576 and

24  2,902,769. Wilson Decl., Ex. 6 (Certificates of Registration), 9 (Trademark
    Application/Registration Status Report).

25  [8]Even if the Court were to conclude that the nominative fair use test should be applied to
    Defendants' use of HENDRIX in Defendants' URL addresses and business names, the Defendants

26  have not satisfied the nominative fair use test. As to the first part of the test, Defendants' use of
    Plaintiffs' trademarked HENDRIX is not necessary to describe Defendants' products. See Welles,

1    **C.    Likelihood of Confusion**

2    In order for a defendant's use of a plaintiff's trademark to qualify as "classic fair use,"

3    a defendant must prove that (i) it does not use the term or phrase at issue as a trademark or

4    service mark, (ii) it uses the term or phrase "fairly and in good faith," and (iii) it uses the

5    term or phrase only to describe its goods or services. Cairns, 292 F.3d at 1151. Defendants

6    do not claim that they have made a classic fair use of the marks at issue in Plaintiffs' motion

7    for partial summary judgment. Rather, Defendants respond point by point to Plaintiffs'

8    discussion of the eight Sleekcraft factors. Thus, the remaining inquiry is whether

9    Defendants' use of Plaintiffs' marks is likely to cause confusion. For purposes of the

10    Lanham Act, the Ninth Circuit recognizes several different multi-factor tests for assessing

11    whether a likelihood of confusion exists. White v. Samsung Elecs. Am., Inc., 971 F.2d 1395,

12    1400 (9th Cir. 1992). None of these standards has been held "correct to the exclusion of the

13    others," id.; however, the Sleekcraft factors appear to be the most frequently used by the

14    courts in the Ninth Circuit. In applying the Sleekcraft analysis, the "factors should not be

15    rigidly weighed" and the Court should "not count beans." Dreamwerks Prod. Group, Inc. v.

16    SKG Studio dba DreamWorks SKG, 142 F.3d 1127, 1129 (9th Cir. 1998). "The test is a

17    fluid one and the plaintiff need not satisfy every factor, provided that strong showings are

18    made with respect to some of them." Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625,

19    631 (9th Cir. 2005). The relevant, non-exhaustive factors include: (i) the strength of the

20    mark; (ii) the proximity of the goods; (iii) the similarity of the marks; (iv) evidence of actual

21    confusion; (v) the marketing channels used; (vi) the type of goods and the degree of care

22    likely to be exercised by the purchaser; (vii) the defendant's intent in selecting the mark; and

23

24    279 F.3d at 804. Like Welles' use of "PMOY '81" in the wallpaper of her website, Defendants' use
25    of Plaintiffs' HENDRIX mark in Defendants' URL addresses and business names does not appear to
      describe Jimi Hendrix. See Response, at 3. Defendants' use does not accompany any image of or
      created by Jimi Hendrix. See id. Thus, the Defendants' use of Plaintiffs' HENDRIX mark in
26    Defendants' URL addresses and business names fails the first prong of the nominative fair use test.

1  (viii) the likelihood of expansion of the product lines.  <u>AMF Inc. v. Sleekcraft Boats</u>, 599

2  F.2d 341, 348-49 (9th Cir. 1979).

**1.     First Sleekcraft Factor: Strength of Plaintiffs' Marks**

4      The scope of trademark protection given to a mark depends on the strength of the

5  mark; strong marks, which are inherently distinctive, receive greater protection than weak

6  marks, such as a descriptor.  <u>Sleekcraft</u>, 599 F.2d at 349.  In the Court's August 7, 2008

7  Order in the Electric Hendrix litigation (C07-338Z, docket no. 104) (citing <u>Pirone v.</u>

8  <u>MacMillian, Inc.</u>, 894 F.2d 579, 583 (2d Cir. 1990)), the Court noted that a person's name is

9  a descriptive trademark and requires secondary meaning in order to be afforded trademark

10  protection.  When analyzing the strength of a name used as a trademark, the particular facts

11  of the name and the goods must be analyzed.  <u>See</u> <u>Scarves by Vera, Inc. v. Todo Imports</u>

12  <u>Ltd.</u>, 544 F.2d 1167, 1173 (2d Cir. 1976).  A famous person's name may have secondary

13  meaning if it is likely to be recognized by prospective purchasers.

*a.     HENDRIX*

15      The Court has previously held that the name Jimi Hendrix is a famous name and that it

16  has acquired a secondary meaning.  Order (C07-338Z, docket no. 104), at 17.  Defendants do

17  not argue that the name HENDRIX alone would not be recognized by prospective

18  purchasers.  Thus, the Court holds that HENDRIX is a famous name and has acquired a

19  secondary meaning.  Accordingly, the Court holds that Plaintiffs' HENDRIX trademarks are

20  strong marks and this factor can only support infringement.

*b.     Plaintiffs' Bust Logo*

22      Plaintiffs have registered and used a variety of trademarks which incorporate a black

23  and white silhouette image depicting Jimi Hendrix.  <u>See</u> Wilson Decl., Ex. 6 (Certificates of

24  Registration), 9 (Trademark Application/Registration Status Report) (<u>see, e.g.</u>, registration

25  nos. 2,250,912 and 3,297,741).  Plaintiffs' incontestable Bust Logo is a high-contrast black

26  and white silhouette image with the word EXPERIENCE arched above the bust and the word

HENDRIX below the bust.  Wilson Decl., Ex. 6 (Certificates of Registration), 9 (Trademark Application/Registration Status Report) (registration no. 2,250,912 (Plaintiffs' Incontestable Bust Logo)).  The Court has previously held that the arbitrary nature of this mark's features, such as text placement, artistic choices in image style, and overall feel, make this mark a strong one even apart from the strength of the secondary meaning associated with HENDRIX.  Order (C07-338Z, docket no. 104), at 17.

### c.    Plaintiffs' Signature Mark

The Court also holds that Plaintiffs' signature mark is a strong mark.  As the Court has previously held, the Jimi Hendrix name has a secondary meaning.  Order (C07-338Z, docket no. 104), at 17.  Plaintiffs' Jimi Hendrix signature mark consists of the Jimi Hendrix name written in script on one line with a more prominent uppercase J and uppercase H to begin each name.  Janie Hendrix Decl. ¶ 9; Wilson Decl. Ex. 6 (Certificates of Registration), 9 (Trademark Application/Registration Status Report) (see, e.g., registration no. 3,001,465).  The Court holds that the arbitrary nature of this mark's features, such as text placement and the use of script lettering make this mark a strong mark even apart from the strength of the secondary meaning associated with JIMI HENDRIX as well.  See Order (C07-338Z, docket no. 104), at 17.

### d.    Conclusion Regarding the First Sleekcraft Factor

Thus, the Court concludes that the first Sleekcraft factor, the strength of Plaintiffs' marks, weighs in favor of finding that Defendants have infringed upon Plaintiffs' registered HENDRIX, Bust Logo, and JIMI HENDRIX Signature marks.

### 2.    Second Sleekcraft Factor: Proximity or Relatedness of Goods

The second Sleekcraft factor looks at the proximity or relatedness of Plaintiffs' and Defendants' goods.  599 F.2d at 350.  Goods are related if consumers are likely to associate the two product lines.  Surfvivor Media, 406 F.3d at 633.  It is undisputed that Defendants and Plaintiffs each sell or license goods such as T-shirts, posters, household goods, and

1   jewelry.  Response, at 5; Jinka Decl., Ex. 2-4, 6-7.  Although Defendants argue that

2   Defendants deal in fine art while Plaintiffs do not, Defendants do not cite to any evidence to

3   support this claim.  Response, at 6.  Thus, the second Sleekcraft factor favors Plaintiffs.

4                   **3.      Third Sleekcraft Factor: Similarity of the Marks**

5           When considering the similarity of marks, the marks should be evaluated as they

6   appear in the market place as a whole and the appearance, sound, and meaning of the marks

7   should be analyzed individually.  Mattel, Inc. v. MCA Records, Inc., 28 F.Supp.2d 1120,

8   1147 (C.D. Cal. 1998).  Defendants argue that sight is the most significant factor in

9   determining similarity when purchases are more likely to occur when browsing in a store or

10  online.  Response, at 6 (citing One Indus., LLC v. Jim O'Neal Distrib., Inc., 578 F.3d 1154

11  (9th Cir. 2009), cert. denied, 2010 WL 757711).  In O'Neal, the court considered the

12  similarity between marks that appeared on motorcycle helmets.[9]  578 F.3d at 1162.  The

13  Court stated that "[b]ecause any consumer confusion in this case would occur as motocross

14  enthusiasts select helmets inside a store or during online browsing, *sight* is significantly more

15  important when comparing these marks than sound or meaning."  Id.  The court noted that

16  "[v]erbally articulating the rounded O' mark [of O'Neal] or the One Icon [of One Industries],

17  or mentally pondering the meaning of the marks, is not part of buying a motorcycle helmet."

18  Id. at 1163.

19                   *a.      URL Addresses and Business Names*

20          The Court finds that Defendants' URL addresses and business names are similar in

21  sight, sound, and meaning to Plaintiffs' incontestable text marks.[10]  Plaintiffs' incontestable

22  _____

23  [9] O'Neal's mark at issue consisted of a boxy 'O' with rounded corners followed by an apostrophe.
    O'Neal, 578 F.3d at 1156-57.  One Industries' "One Icon" consisted of two interlacing number ones.
24  Id. at 1157.

25  [10] The Court should consider whether Defendants' marks used in Defendants' URL addresses and
    business names are similar to Plaintiffs' marks in sight, sound, and meaning because neither
26  Defendants' marks used in the URL addresses and business names nor Plaintiff's incontestable text
    marks are a symbol that one would fail to verbally articulate and ponder the meaning of.  See
    O'Neal, 578 F.3d at 1163 (an O' mark and a One Icon were not marks that a consumer would

1   text marks include AUTHENTIC HENDRIX,[11] EXPERIENCE HENDRIX,[12] and JIMI

2   HENDRIX.[13]  Wilson Decl., Ex. 6 (Certificates of Registration), 9 (Trademark

3   Application/Registration Status Report).  Defendants' business is incorporated as

4   HendrixLicensing.com, Ltd.  Pitsicalis Decl., at 1.  Defendants' merchandise is sold at the

5   URL address www.hendrixartwork.com.  Jinka Decl. ¶ 3 (Fig. 1, 2).  All of Defendants'

6   URL addresses and business names share the word HENDRIX in common with Plaintiffs'

7   incontestable text marks.  This similarity is not surprising as both Plaintiffs and Defendants

8   market goods related to Jimi Hendrix.  See Jinka Decl. ¶¶ 3-7.  The primary distinguishing

9   characteristics of Defendants' marks are the use of the words ARTWORK or LICENSING

10  and the placement of ARTWORK or LICENSING after HENDRIX.  Considering the sound

11  of Defendants' and Plaintiffs' marks, the Court concludes that Hendrix Artwork and

12  Authentic Hendrix sound similar in that they share the same root of HENDRIX.  In addition,

13  ARTWORK and AUTHENTIC both begin with a soft 'a' sound and end with a hard 'c'

14  sound.  However, the Court concludes that the similarity between the sound of Hendrix

15  Artwork and Experience Hendrix, and between Hendrix Licensing and Authentic Hendrix

16  and Experience Hendrix, is not as strong.  Although these marks likewise share the root of

17  HENDRIX, ARTWORK does not share any notable sound with EXPERIENCE, and

18  LICENSING does not share any notable sound with either AUTHENTIC or EXPERIENCE.

19  Thus, the Court concludes that the sound of the marks are somewhat similar.

20      The Court also concludes that the appearance of the marks is similar.  Each of

21  Plaintiffs' incontestable text marks and Defendants' text marks include the root HENDRIX

22  paired with one other substantive word.  As the Ninth Circuit noted in Dreamwerks, 142 F.3d

23

24  verbally articulate or ponder the meaning of).

25  [11] Registration no. 2,245,408.

26  [12] Registration no. 2,245,409.

[13] Registration no. 2,902,769.

at 1131, when considering the similarity of "Dreamwerks" and "DreamWorks," "a perceptive consumer who does notice the 'e' and lower-case 'w' in Dreamwerks might shrug off the difference as an intentional modification identifying an ancillary division of the same company."  Similarly, while a consumer might notice that Defendants follow HENDRIX with either LICENSING or ARTWORK, while Plaintiffs precede HENDRIX with AUTHENTIC or EXPERIENCE, a consumer might also "shrug off the difference as an intentional modification identifying an ancillary division of the same company." Id.

The overall meaning of the marks is more difficult to determine; however, the Court concludes that there is similarity between the words AUTHENTIC and LICENSING in that they both call to mind authority and ownership on the part of the mark holder.  AUTHENTIC implies validity of the product, and LICENSING implies a legal right to the product.  In addition, the Court should conclude that there is similarity in meaning between AUTHENTIC and ARTWORK.  Although AUTHENTIC and ARTWORK both have distinct meanings, when paired with HENDRIX, both imply something created by Jimi Hendrix.

Therefore, the Court concludes that Defendants' URL addresses and business names are similar to Plaintiffs' incontestable text marks in sight, sound, and meaning.  This factor weighs in favor of infringement with relation to Defendants' URL addresses and business names.

### b.    *Defendants' Headshot Logo*

Plaintiffs' incontestable design mark depicts a high contrast black and white silhouette Jimi Hendrix bust with the word EXPERIENCE in capital letters arched over Jimi Hendrix's head and the word HENDRIX in capital letters below the bust.  Wilson Decl., Ex. 6 (Certificates of Registration), 9 (Trademark Application/Registration Status Report) (registration no. 2,250,912).  Defendants' Headshot Logo depicts an image of Jimi Hendrix's head from the mouth up as part of the head of an electric guitar.  See Jinka Decl., Ex. 1, 2

1   (Fig. 1, 2), 3 (Fig. 3), 4 (Fig. 1), 5 (Fig. 2), 7.  The neck of the guitar extends to the left from

2   the head, and the word HENDRIX is printed in capital letters over the neck.  Id.

3   ARTWORK.COM is printed in capital letters on the neck of the guitar.  Id., Ex. 2 (Fig. 1, 2),

4   4 (Fig. 1).

5       Two notable similarities are immediately apparent in the appearance of the design

6   marks: the use of the word HENDRIX in all capital letters and the rendering of the image of

7   Jimi Hendrix in a silhouette-like picture.[14]  Both images also feature Jimi Hendrix's

8   distinctive Afro.  There are differences in the design marks as well.  Defendants place their

9   text to the left of Jimi Hendrix where Plaintiffs chose to surround the image.  Defendants'

10  stylized text is different than Plaintiffs' block font, although both use all capitals.  In

11  addition, Defendants incorporate a guitar design and Jimi's signature into their design.

12  Overall, however, the Court concludes that the marks convey the same dominant impression

13  when the focal point of both marks is an image of Jimi Hendrix, both refer to Jimi Hendrix

14  by incorporating his name into the design, and both use all capital letters for HENDRIX.  For

15  these reasons, the Court finds that the design marks have an overall similarity and this factor

16  weighs in favor of Plaintiffs.

17                          *c.    Defendants' Signature Mark*

18      Finally, Defendants argue that Defendants' signature mark differs from Plaintiffs'

19  signature mark when using the test of sight.  Although Defendants have highlighted certain

20  differences, including the relative position of the first and last name, as either one atop the

21  other or side by side, and the divergent shapes of the capital "J" and the capital "H," see

22  Response at 6, the Court finds that the two scripts, especially everything following the "H" in

23  the last name, look virtually identical to "an untrained eye" (the standard presented by

24  Plaintiffs and not contested by Defendants).  The signature mark used by Defendants was

25  _____

26  [14] Defendants' image of Jimi Hendrix in Defendants' design mark is also very similar to the image of
    Jimi Hendrix used by Electric Hendrix.  Compare Wilson Decl., Ex. 1 (Pitsicalis Business Card)
    with Jinka Decl., Ex. 2 (Fig. 1, 2) (Defendants' Headshot Logo).

previously used by Electric Hendrix.  Wilson Decl., Ex. 4 (Pitsicalis Depo. (C07-338Z)), at

51.  Parties related to Electric Hendrix had sought to modify that Jimi Hendrix signature to

make it look more similar to Plaintiffs' version of the Jimi Hendrix signature mark.  Wilson

Decl., Ex. 11, at RA0004903 (Email from Craig Dieffenbach) ("[W]e need to replace the 'H'

in Hendrix to look more like Janie's version.").  Thus, the Court concludes that the signature

marks appear to be similar to each other.

In addition, the Court concludes that the signature marks convey the same meaning.

More than a plain text version of a person's name, a signature generally conveys a special

authorization or approval of a product.  Because both Plaintiffs and Defendants use a

signature mark on some of their products, both signature marks convey the same meaning.

See, e.g., Jinka Decl., Ex. 3 (showing posters sold by both Plaintiffs and Defendants that

incorporate their respective signature marks).

The Court finds that the signature marks are similar, and this factor weighs in favor of

infringement.

### 4.    Fourth Sleekcraft Factor: Evidence of Actual Confusion

Evidence of actual confusion is persuasive evidence that future confusion is likely.

O'Neal, 578 F.3d at 1163.  However, because evidence of actual confusion is often difficult

to obtain, its absence is often given little weight.  Cohn v. Petsmart, Inc., 281 F.3d 837, 842-

43 (9th Cir. 2002).  Plaintiffs have not presented any evidence of actual confusion caused by

Defendants' marks.  Thus, the Court finds that this factor weighs slightly in favor of

Defendants.

### 5.    Fifth Sleekcraft Factor: Convergence of Marketing Channels

Defendants concede that Plaintiffs and Defendants sell products through similar

marketing channels of online and retail stores for apparel and posters.  Response, at 7.

Defendants argue, however, that Plaintiffs and Defendants do not have converging marketing

channels as to fine art of images and likenesses of Jimi Hendrix as well as original visual

1   artwork authored by Jimi Hendrix.  Id.  Defendants do not provide any evidence to support

2   this contention.  Thus, because Defendants concede that Defendants use similar marketing

3   channels to Plaintiffs, the Court finds that this factor weighs in favor of infringement.

4                   **6.    Sixth Sleekcraft Factor: Degree of Customer Care**

5         Defendants concede a general lack of searching discernment of consumers of the

6   apparel and posters marketed by Defendants and Plaintiffs.  Response, at 7.  However,

7   Defendants argue that consumers of fine art images and likenesses of Jimi Hendrix and of

8   original visual artwork by Jimi Hendrix will not lack searching discernment.  Id.  In addition,

9   Defendants argue that any lack of discernment by consumers favors Defendants because

10  consumers of Plaintiffs' and Defendants' products will have "little to no concern about origin

11  at all, and make their purchases based on the image, likeness, or authentic visual artwork by

12  or of Jimi Hendrix adorning the product."  Id. at 7-8.  Defendants, however, do not provide

13  any support for their contentions that consumers of fine art images and likenesses of Jimi

14  Hendrix and artwork by Jimi Hendrix will not lack searching discernment (or even that

15  Defendants market fine art images and likenesses of Jimi Hendrix and visual artwork by Jimi

16  Hendrix).  See id.

17        Because Defendants concede that consumers of their products and of Plaintiffs'

18  products will lack any searching discernment as to origin when purchasing, the Court finds

19  that this factor weighs in favor of infringement.

20                  **7.    Seventh Sleekcraft Factor: Intent of Defendant**

21        A defendant who knowingly crafts his mark to emulate a plaintiff's mark is presumed

22  to have accomplished his purpose and this intent weighs heavily in favor of a plaintiff.

23  Sleekcraft, 599 F.2d at 354.  Mr. Pitsicalis had knowledge of Plaintiffs' trademark

24  infringement claims against Electric Hendrix in the Electric Hendrix litigation.  Mr. Pitsicalis

25  was deposed in the Electric Hendrix lawsuit.  Wilson Decl., Ex. 4 (Pitsicalis Depo. (C07-

26  338Z));  see also Karen Davis Decl., docket no. 10, Ex. 8 (Letter from Plaintiffs' Counsel), 9

1    (Letter from Defendants' Counsel), 10 (Letter from Plaintiffs' Counsel), 11 (Letter from

2    Defendants' Counsel).  In addition, Defendants represented through an attorney that Mr.

3    Pitsicalis had, individually and through his attorneys, scrutinized the Court's decision in the

4    Electric Hendrix litigation involving the Hendrix trademarks, likeness, and image.  Wilson

5    Decl., Ex. 13, at TANAKA 0039.  Defendants also used the same signature mark that was

6    used by Electric Hendrix.  Id., Ex. 4 (Pitsicalis Depo. (C07-338Z)), at 51.[15]

7        Defendants allege that Plaintiffs have provided no evidence to show that Defendants

8    intentionally crafted their marks to emulate Plaintiffs' marks.  Defendants argue that

9    Defendants "made a strong, good faith effort to *avoid* infringing [Plaintiffs'] marks."

10    Response, at 8 (emphasis in original).  However, Defendants provide no evidence indicating

11    what effort Defendants made to avoid infringing Plaintiffs marks.

12        Because Defendants knew of the litigation in the Electric Hendrix lawsuit, and

13    because Defendants represented through their attorney that Defendants had "scrutinized the

14    [C]ourt's decision involving the Hendrix trademarks, likeness, and image," before using

15    Defendants' marks, the Court finds that this factor favors Plaintiffs.  See Wilson Decl., Ex.

16    13, at TANAKA 0039.

17            **8.    Eighth Sleekcraft Factor: Likelihood of Expansion**

18        Defendants concede that they will likely expand into other areas that may overlap with

19    Plaintiffs.  Thus, the Court finds that this factor weighs in favor of infringement.

20    _____

21    [15] In John D. Wilson's declaration, Plaintiffs also allege that Defendants advertised T-shirts with
      images which are copyrighted by Plaintiffs.  Wilson Decl. ¶ 16, Ex. 15 (Defendants' T-shirts with

22    images Plaintiffs allege are copyrighted by Plaintiffs have a red checkmark on them).  Plaintiffs
      provide a copyright registration for images taken by photographer Chuck Boyd; however, Plaintiffs
      do not indicate which of the images provided were allegedly used by Defendants on Defendants'

23    T-shirt designs.  Id. ¶ 15, Ex. 14.  In addition, these images are dark, which makes it difficult to
      compare the images to the allegedly infringing T-shirt designs.  See id.  Defendants provide

24    evidence that the T-shirt designs match specific photographs which Defendants claim to have legal
      license to.  Michael Biggs Decl., docket no. 48.  Because Plaintiffs do not indicate which images are

25    allegedly infringed upon, and because Defendants provide some evidence that the T-shirt designs are
      not infringing upon Plaintiffs' copyright, the Court does not find Plaintiffs' allegations of copyright

26    infringement to be evidence that Defendants intentionally crafted their marks to emulate Plaintiffs'
      marks.

1

**D.    Conclusion Re. Likelihood of Confusion**

2     For the foregoing reasons, the Court finds that, under the <u>Sleekcraft</u> factors, there is a

3     likelihood of confusion caused by Defendants' marks.

4     **CONCLUSION**

5     The Court GRANTS Plaintiffs' Motion for Partial Summary Judgment of Federal

6     Trademark Infringement Claim, docket no. 43.  Because the Court finds that Defendants'

7     marks do not fall under the nominative or classic fair use exception, and because the Court

8     finds that Defendants' marks are likely to cause confusion, the Court finds that Defendants'

9     use of Plaintiffs' marks in Defendants' URL addresses and business names, Defendants' use

10    of Defendants' Headshot Logo, and Defendants' use of Defendants' signature mark infringed

11    on Plaintiffs' registered trademarks.

12    Plaintiffs' counsel shall file a proposed form of permanent injunction consistent with

13    this Order and note the matter on the Court's calendar for the second Friday after filing the

14    proposed injunction.  Any objections to form shall be filed by the noting date.  No reply shall

15    be filed unless requested by the Court.

16    IT IS SO ORDERED.

17    DATED this 19th day of May, 2009.

18

19                                                        Thomas S. Zilly
                                                          United States District Judge
20

21

22

23

24

25

26

ORDER - 22