THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EXPERIENCE HENDRIX, L.L.C., et al.,

                Plaintiffs,

vs.

HENDRIXLICENSING.COM, LTD, et al.,

                Defendants.

No.  C09-285Z

ORDER

THIS MATTER comes before the Court on defendants' motion for partial summary judgment, docket no. 67, which the Court previously granted in part, denied in part, and deferred in part, _see_ Order (docket no. 102), and on plaintiffs' motion (as counterclaim defendants) for partial summary judgment, docket no. 64, as to defendants' state law counterclaims.  Having reviewed all materials submitted in support of, and in opposition to, each motion, and having considered the oral arguments of counsel, the Court now enters the following Order.

**Background**

This case is part of a continuing saga of litigation concerning the legendary performer Jimi Hendrix.  When he died intestate in 1970, Jimi Hendrix was domiciled in the State of New York.  Under New York law, prior to his death, Jimi Hendrix enjoyed a statutory right not to have his name, portrait, or picture used for advertising or trade purposes without his written consent.  *See* Order at 5-7 (docket no. 47), *Experience Hendrix, L.L.C. v. The James Marshall Hendrix Foundation*, Case No. C03-3462Z (W.D. Wash. Apr. 15, 2005) (citing N.Y. Civ. Rights Law §§ 50 & 51[1]), *aff'd*, 240 Fed. Appx. 739 (9th Cir. 2007) [the "*Foundation*" case].  In New York, this right is explicitly denominated a "right of privacy," but it is also commonly referred to as a "right of publicity."

In the *Foundation* case, the Court concluded that, pursuant to the law of New York, Jimi Hendrix's right of publicity did not survive his passing and did not descend to his father and sole heir, James A. Hendrix ("Al Hendrix").  *See id.* at 7.  As a result, whatever rights were subsequently assigned by Al Hendrix to plaintiffs Experience

---

[1] These New York statutes date back to 1903, and Section 50 has remained unchanged since 1909.  Section 50 provides that "[a] person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of *any living person* without having first obtained the written consent of such person . . . is guilty of a misdemeanor."  N.Y. Civ. Rights Law §50 (emphasis added).  Section 51 permits "[a]ny person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided" to "sue and recover damages for any injuries sustained by reason of such use," and further authorizes exemplary damages "if the defendant shall have knowingly used such person's name, portrait, picture or voice in such manner as is forbidden or declared to be unlawful by section fifty of this article."  N.Y. Civ. Rights Law §51.

Hendrix, L.L.C. and Authentic Hendrix, LLC (collectively, "Experience") did not

include Jimi Hendrix's right of publicity.  Experience, however, owns copyrights in

various songs written by Jimi Hendrix.  *See* R. Hendrix Decl. at ¶ 2 (docket no. 83).

Experience also has several federally registered trademarks incorporating Jimi

Hendrix's name, image, signature, song titles, and/or lyrics.  *See* Ex. 1 to Davis Decl.

(docket no. 10-2).[2]  Finally, Experience operates websites ("www.jimihendrix.com,"

"www.authentichendrix.com") through which Jimi Hendrix related merchandise is

sold.  *See* J. Hendrix Decl. at ¶ 11 (docket no. 8).  On at least one of these websites,

Experience proclaims, contrary to the Court's earlier ruling, that it is "the sole

controlling entity overseeing all aspects and uses of Jimi Hendrix's name, likeness,

and image."  *See* Ex. D to Shea Decl. (docket no. 65-2).

   Shortly after the Ninth Circuit affirmed this Court's ruling in the *Foundation*

case that Experience has no right of publicity associated with Jimi Hendrix, the

Washington legislature amended the Washington Personality Rights Act ("WPRA").

In 2008, RCW 63.60.010 was revised to provide *inter alia* that the property right in an

individual's or a personality's "name, voice, signature, photograph, or likeness" "does

not expire upon the death of the individual or personality, regardless of whether the

---

[2] Experience's word marks include "AUTHENTIC HENDRIX," "EXPERIENCE HENDRIX," "JIMI HENDRIX," and "ELECTRIC LADYLAND."  *See* Order at 4-5 (docket no. 104), *Experience Hendrix, L.L.C. v. Electric Hendrix, LLC*, Case No. C07-338Z (W.D. Wash. Aug. 7, 2008).  In addition, Experience claims rights to *inter alia* the following design marks (shown at right):  "AUTHENTIC HENDRIX BUST," "I AM EXPERIENCED," and "JIMI HENDRIX SIGNATURE."  Some of these marks have become incontestable.  *See id.*



law of the domicile, residence, or citizenship of the individual or personality at the time of death or otherwise recognizes a similar or identical property right."

Defendants[3] Andrew Pitsicalis and HendrixLicensing.com, LTD distribute or seek to distribute posters, fine art prints, apparel, and other novelty items bearing the likeness of, or art created by, Jimi Hendrix, accompanied with his name.  Pitsicalis was formerly associated with Craig Dieffenbach and Electric Hendrix, LLC (collectively, "Dieffenbach"), as to whom the Court previously issued a permanent injunction against commercial use of the phrases JIMI HENDRIX ELECTRIC, JIMI HENDRIX ELECTRIC VODKA, HENDRIX ELECTRIC, and HENDRIX ELECTRIC VODKA.  *See* Order at 5 and Suppl. Judgment & Permanent Injunction (Case No. C07-338Z, docket nos. 104 & 127).  Pitsicalis is undisputedly aware of the prior suit between Experience and Dieffenbach, and his current business endeavors are not alleged to be in violation of the Court's earlier injunction.

Instead, in this action, Experience contends that defendants have violated the Lanham Act, as well as the Washington Consumer Protection Act ("CPA") and state common law, by using certain business names ("Hendrix Licensing," "Hendrix Artwork"), domain names (www.hendrixlicensing.com, www.hendrixartwork.com),

---

[3] Pitsicalis's wife, Christine Flaherty, was originally named as a defendant in this action. Pursuant to defendants' unopposed motion, Experience's claims against Flaherty were dismissed with prejudice.  *See* Order at 4 (docket no. 102).  Flaherty's counterclaims against Experience, however, still remain in the case.

ORDER - 4

and logos ("guitar and headshot," "signature").[4]  Experience also seeks to inhibit

defendants from employing various song titles and lyrics (AXIS: BOLD AS LOVE,

PURPLE HAZE, CASTLES MADE OF SAND, FIRE, FOXY LADY, STONE FREE,

HIGHWAY CHILE, THE WIND CRIES MARY), as well as stylized renditions of the

names "HENDRIX" and "JIMI HENDRIX."  Experience contends that defendants'

references to Jimi Hendrix and use of his likeness "create a false association between

[Experience] and [d]efendants' products, to the benefit of [d]efendants, and the

detriment of [Experience] and [its tradem]arks."  Amended Complaint at 21, ¶ 38(g)

(docket no. 5).

After commencing this lawsuit, counsel for Experience sent a letter, along with

a copy of the complaint, to Spencer Gifts, LLC, one of defendants' customers.  _See_

Ex. E to Shea Decl. (docket no. 65-2).  The letter identified one of plaintiffs' registered

marks, namely the design mark "AUTHENTIC HENDRIX BUST," and indicated that

suit had been commenced against defendants for "unauthorized use and licensing" of

"similar or identical" marks.  _Id._  The letter summarized Experience's understanding

that Spencer Gifts "sells, advertises, and distributes goods that use the allegedly

infringing marks."  _Id._

---

[4] The Court has already granted partial summary judgment in favor of Experience on the
infringement claim, holding that defendants' use of the aforementioned business names,
domain names, and logos infringe Experience's registered marks.  _See_ Order (docket no. 57).
Experience, however, did not move for, and the Court did not grant, partial summary
judgment as to defendants' use of the names "HENDRIX" or "JIMI HENDRIX," which might
constitute nominative fair use.  _See_ Order at 3-10 (docket no. 27).

Also after initiating this action, Experience issued a press release accusing defendants of "purposefully committ[ing] gross trademark infringements _and other illegal acts_ through their marketing and licensing of Jimi Hendrix branded merchandise." Ex. 1 to Minutes (docket no. 103) (emphasis added). The press release further indicated that Experience Hendrix, L.L.C. and Authentic Hendrix LLC "are the family owned companies entrusted with preserving and protecting Jimi's Legacy." _Id._

Experience subsequently sought a preliminary injunction. The Court denied Experience's motion in part, concluding that defendants' use of the names "HENDRIX" or "JIMI HENDRIX" to identify either (i) the individual portrayed in an image, or (ii) the author of certain artwork, falls within the category of nominative fair use. The Court declined to preclude such nominative fair uses of "HENDRIX" or "JIMI HENDRIX." _See_ Order (docket no. 27).

After the preliminary injunction issued, counsel for Experience sent another letter to Spencer Gifts, enclosing a copy of the preliminary injunction; counsel did not, however, include the related order in which the Court declined to enjoin any nominative fair use of the names "HENDRIX" and "JIMI HENDRIX." _See_ Ex. F to Shea Decl. (docket no. 65-2 at 31-32). In subsequent discussions with counsel for Spencer Gifts, counsel for Experience allegedly took "the position that the court's injunction prohibits [Spencer Gifts] from selling _any_ merchandise from HendrixLicensing or related companies." Ex. 1 to Osinski Decl. (docket no. 79-1) (emphasis added).

Having learned of these communications, counsel for defendants requested that counsel for Experience issue an opinion letter (or retraction) clarifying that Spencer Gifts may sell products featuring images and likenesses of Jimi Hendrix without running afoul of the Court's preliminary injunction or risking liability for trademark infringement.  _See_ Ex. 3 to Osinski Decl. (docket no. 79-3).  The requested "retraction" was allegedly never made.  _See_ Amended Answer & Counterclaims at 13, ¶ 14 (docket no. 52).  As a result, despite having a keen interest in arguably non-infringing products bearing images of Jimi Hendrix that would be licensed by Andrew Pitsicalis, Spencer Gifts did not place any orders for these products.  _See_ Rosenberg Decl. (docket no. 78).

Defendants allege that Experience's press release and communications with Spencer Gifts are actionable under one or more of the following theories:  trade libel or defamation, tortious interference with business expectancy, or tortious interference with contractual relations.  In addition, defendants contend that Experience's public misrepresentations concerning exclusive control over the "name, likeness, and image" of Jimi Hendrix violate the CPA.  In their motion for partial summary judgment, Experience Hendrix, L.L.C. and Authentic Hendrix, LLC, as counterclaim defendants, seek dismissal of all of these state law counterclaims.

Experience did not, however, move for partial summary judgment as to defendants' declaratory judgment counterclaims.  In those counterclaims, defendants seek judicial declarations that the 2008 amendments to the WPRA do not apply to Jimi

Hendrix and that defendants may "trade in original images and likenesses of Jimi Hendrix" without infringing plaintiffs' trademark rights.  Amended Answer and Counterclaims at ¶¶ 19 & 23 (docket no. 52).  Unlike Experience, defendants have moved for partial summary judgment on these two counterclaims, but not on the four state law counterclaims.  Defendants also seek dismissal of plaintiffs' claim for false designation of origin.

**Discussion**

**A.    Standard for Summary Judgment**

The Court must grant summary judgment if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (2010).  The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To support an assertion that a fact either cannot be or is genuinely disputed, a party must (i) cite to "particular parts of materials in the record," (ii) show that materials in the record "do not establish the absence or presence of a genuine dispute," or (iii) demonstrate that the adverse party "cannot produce admissible evidence" of the alleged fact.  Fed. R. Civ. P. 56(c)(1) (2010).  All "justifiable inferences" are to be drawn in favor of the non-moving party.  *Anderson*, 477 U.S. at 255.  When the record, however, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party,"

summary judgment is warranted.  *See* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.    Washington Personality Rights Act**

Experience has attempted in various ways to steer clear of the constitutional thicket surrounding the 2008 amendments to the WPRA.  Not only has Experience omitted from the Amended Complaint any cause of action predicated on the WPRA, Experience has explicitly asserted that the WPRA "has nothing to do with this lawsuit."  Motion at 2 n.1 (docket no. 64).  Experience, however, does not appear to concede that Jimi Hendrix's right of publicity expired upon his death.  To the contrary, the gravamen of Experience's complaint is that defendants make "explicit and implicit references to Jimi Hendrix," "his musical legacy," and "celebrity status" and use "prominent photographs of Jimi Hendrix."  Amended Complaint at 21, ¶ 38(g) (docket no. 5).  These allegations implicate the "right of publicity" Experience covets and the very statute Experience wishes this Court to ignore.  Thus, despite all efforts to the contrary, Experience cannot escape the fundamental issue in this case, namely whether the 2008 amendments to the WPRA had the effect of vesting in Experience any right of publicity relating to Jimi Hendrix such that Experience may preclude defendants from trading in images of, or art created by, Jimi Hendrix.

Having recognized the pivotal role played in this litigation by the legislative changes that took effect in 2008, which defendants contend are unconstitutional on several grounds, the Court certified to the Washington State Attorney General,

pursuant to Federal Rule of Civil Procedure 5.1(b), that a constitutional challenge to the WPRA had been made in this case.  Notice (docket no. 91).  The Washington State Attorney General has elected not to intervene in this case.  Notice (docket no. 101).  Because a ruling that Experience now possesses a post-mortem right of publicity associated with Jimi Hendrix would resolve most, if not all, of defendants' counterclaims in Experience's favor, the Court must first address whether the WPRA applies and, if so, whether the 2008 amendments to the statute are constitutional.

1.    **History of the WPRA**

The WPRA was first enacted in 1998, almost thirty years after Jimi Hendrix died.  When initially adopted, the statute declared that "[e]very individual or personality . . . has a property right in the use of his or her name, voice, signature, photograph, or likeness."  Laws of 1998, ch. 274, § 1 (codified as RCW 63.60.010 (1998)).  The original statute further provided that such property right "does not expire upon the death of the individual or personality" and exists "whether or not it was commercially exploited . . . during the individual's or the personality's lifetime."  *Id.* A personality is distinguished from an individual by having a name, voice, signature, photograph, or likeness that has commercial value.  RCW 63.60.020(8).  *But see* J. Thomas McCarthy, 1 Rights of Publicity & Privacy § 6:39 (2d ed. 2010) [hereinafter "McCarthy on Rights of Publicity"] ("In the author's opinion, *everyone's* persona and identity has *some* 'commercial value' during life and at the time of death.  That value may be large or small, but it cannot be said to be nonexistent, no matter how 'obscure'

the person." (emphasis in original, critiquing Cal. Civil Code § 3344.1(h), containing a definition similar to RCW 63.60.020(8))).

In the <u>*Foundation*</u> case, the Court observed that the WPRA, as originally enacted, did not contain any choice-of-law provision. <u>*See*</u> Order at 8 (Case No. C03-3462Z, docket no. 47). The Court therefore declined to apply the WPRA in determining whether Jimi Hendrix's right of publicity descended to Al Hendrix, and instead looked to New York law. Apparently in response to the Ninth Circuit's decision affirming this Court's ruling, the Washington legislature substantially amended the WPRA. <u>*See*</u> Senate Report, House Bill 2727, 60th Legislature, 2d Regular Session (Feb. 29, 2008) (summarizing "recent court decisions" that "created the need for this bill").

The modifications to the WPRA fall within three general categories. First, the revisions attempt to make the WPRA retroactive, by indicating that the right of publicity "exists in the name, voice, signature, photograph, or likeness of individuals or personalities deceased before, on, or after June 11, 1998," which was the effective date of the WPRA.[5] Laws of 2008, ch. 62, § 1 (codified as RCW 63.60.010). The right of publicity is "deemed to have existed before June 11, 1998, and at the time of death of any deceased individual or personality . . . for the purpose of determining the

---

[5] The 2008 amendments explicitly indicate that the WPRA "applies to all causes of action commenced on or after June 11, 1998, regardless of when the cause of action arose. To this extent, [the WPRA] applies retroactively, but in all other respects it applies prospectively." Laws of 2008, ch. 62, § 4.

person or persons entitled to these property rights." *Id.*  A "deceased individual" is defined as a natural person who died "within ten years before January 1, 1998, or thereafter," while a "deceased personality" is a personality who died "within fifty years before January 1, 1998, or thereafter."  Laws of 2008, ch. 62, §§ 2(1)&(2); *see* RCW 63.60.020(1)&(2).  The parties do not appear to dispute that Jimi Hendrix would qualify as a "deceased personality" under the WPRA.

Second, the 2008 amendments try to undo the "majority rule" concerning the choice of law applicable to the survivability of the right of publicity.  *See* 2 McCarthy on Rights of Publicity § 11:15 ("Most courts will follow the rule that the existence or non-existence of a post-mortem right of publicity is determined by the law of the state of domicile at the time of death.").  The revised statute provides that the right of publicity "does not expire upon the death of the individual or personality, regardless of whether the law of the domicile, residence, or citizenship of the individual or personality at the time of death or otherwise recognizes a similar or identical property right."  Laws of 2008, ch. 62, § 1 (codified as RCW 63.60.010).  The legislation is accompanied by an expression of intent "to apply to all individuals and personalities, living and deceased, regardless of place of domicile or place of domicile at time of death."  *Id.*

Third, the WPRA, as amended, purports to give effect to (i) inter vivos and testamentary transfers of a right of publicity that were executed before such right was recognized in the State of Washington; and (ii) inter vivos and testamentary transfers,

as well as transfers by intestate succession, of a right of publicity even though the jurisdiction in which the individual or personality at issue was domiciled at the time of the transfer did not recognize such right or treated it as terminating upon death.  The statute specifically provides that the right of publicity "shall be freely transferable, assignable, and licensable, in whole or in part, by any otherwise permissible form of inter vivos or testamentary transfer, . . . whether . . . entered into or executed before, on, or after June 11, 1998."  <u>Id.</u>  Except when transferred inter vivos, the right of publicity "shall be owned by the person entitled to such rights under the deceased individual's or personality's last will and testament or, if none, then by the beneficiaries or heirs under the laws on intestate succession . . . of the individual's or personality's domicile, regardless of whether the law of the domicile of the deceased individual or personality, at the time of death, or thereafter, recognizes a similar or identical property right."  Laws of 2008, ch. 62, § 3(1)(a) (codified as RCW 63.60.030(1)(a)).  Finally, under the 2008 amendments, a right of publicity assigned to a third person during an individual's or a personality's lifetime, or by a successor or heir, may be further transferred or licensed by such third person regardless of whether the law of the domicile of the third person recognizes the right. RCW 63.60.030(1)(b)(iv).

If applied in this litigation, the WPRA would deem all rights to the use of Jimi Hendrix's name, voice, signature, photograph, or likeness as having descended via intestate succession to Al Hendrix and as having been transferred via assignment from

Al Hendrix to Experience.  Such result would preclude defendants, absent Experience's consent, from commercially distributing images of Jimi Hendrix, at least in the State of Washington.[6]  Thus, the Court must analyze whether the WPRA, as amended, now contains a choice-of-law provision that would render the statute controlling in this case.

### 2.       Statutory Directive to Apply Washington Law

Federal courts must apply the forum state's choice of law rules.  *Love v. Assoc. Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010).  In Washington, courts will not engage in a conflict of laws analysis unless an actual conflict exists between the laws or interests of Washington and the laws or interests of another state.  *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 100-01, 864 P.2d 937 (1994).  In this case, the WPRA undeniably dictates a different result than the law of New York concerning the survivability of Jimi Hendrix's right of publicity.

In determining which of two or more conflicting laws to apply, Washington courts use the methodology outlined in the Restatement (Second) of Conflict of Laws § 6 (1971) [hereinafter "Restatement"].  *See Seizer v. Sessions*, 132 Wn.2d 642, 650-52, 940 P.2d 261 (1997).  Section 6 provides that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law."

---

[6] The WPRA permits certain nonconsensual uses of an individual's or personality's name, voice, signature, photograph, or likeness.  *See* RCW 63.60.070.  If the WPRA applies, however, none of these statutory exemptions would insulate defendants from liability.

Restatement § 6(1).[7]  Unlike the original WPRA, the 2008 amendments contain a clear

directive to apply the law of Washington.  Indeed, the revised language appears to

have been simply lifted from a Ninth Circuit opinion that suggests how to phrase a

choice-of-law provision.  _See_ _Cairns v. Franklin Mint Co._, 292 F.3d 1139 (9th Cir.

2002).[8]  Because the WPRA prescribes application of Washington law "regardless of

place of domicile or place of domicile at time of death," RCW 63.60.010, the issue

before the Court is whether such legislative directive is "subject to constitutional

restrictions."  Restatement § 6(1).

Defendants contend that such choice-of-law directive violates the following

provisions of the United States Constitution:  (i) Due Process Clause of the Fourteenth

Amendment; (ii) Full Faith and Credit Clause; (iii) Privileges and Immunities Clause;

(iv) Commerce Clause; (v) Takings Clause; (vi) Free Speech Clause of the First

Amendment; and (vii) Copyright Clause.  Experience counters that defendants lack

---

[7] If no statutory directive exists, then the following factors should be considered:  (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.  Restatement § 6(2).

[8] In _Cairns_, the Ninth Circuit concluded that California's post-mortem right of publicity statute did not apply with respect to Princess Diana, who had been domiciled in Great Britain at the time of her death, observing that California Civil Code § 3344.1 "does _not_ state that California's . . . statute applies to such cases _regardless of the domicile_ of the owner of the right."  292 F.3d at 1147 (emphasis in original).  Instead, § 3344.1 is limited to "cases in which the liability, damages, and other remedies arise from acts occurring directly in this state."  _Id._ (quoting Cal. Civil Code § 3344.1(n)).

standing to challenge the constitutionality of the WPRA and that, because the WPRA

prohibits only infringements occurring within the State of Washington, the statute does

not reach beyond the bounds of constitutionality.  For the reasons explained below, the

Court finds Experience's arguments unpersuasive, and therefore proceeds to a

discussion of defendants' constitutional challenges.

### 3.   Standing Under the Declaratory Judgment Act

Experience contends that defendants lack standing to challenge the WPRA

under the auspices of the Declaratory Judgment Act ("DJA").  The Court disagrees.

Pursuant to the DJA, the Court "may declare the rights and other legal relations of any

interested party seeking such declaration, whether or not further relief is or could be

sought."  28 U.S.C. § 2201.  To be justiciable under the DJA, a dispute must be

"definite and concrete, touching the legal relations of parties having adverse legal

interests," and must be "real and substantial," seeking "specific relief through a decree

of conclusive character, as distinguished from an opinion advising what the law would

be upon a hypothetical state of facts."  _MedImmune, Inc. v. Genentech, Inc._, 549 U.S.

118, 127 (2007) (quoting _Aetna Life Ins. Co. v. Haworth_, 300 U.S. 227, 240-41

(1937)).

With respect to patents or trademarks, a declaratory judgment action seeking a

ruling of invalidity or non-infringement presents the requisite "case or controversy" if

the entity initiating suit "has a real and reasonable apprehension that he will be subject

to liability if he continues to manufacture his product."  _Rhoades v. Avon Prods., Inc._,

504 F.3d 1151, 1157 (9th Cir. 2007) (quoting _Hal Roach Studios, Inc. v. Richard_

_Feiner & Co._, 896 F.2d 1542, 1555-56 (9th Cir. 1990)).  In these contexts, the Ninth

Circuit employs a "flexible approach" that focuses on "the position and perceptions of

the [declaratory judgment] plaintiff" and not on "specific acts or intentions of the

[declaratory judgment] defendant."  _Id._ at 1157-58 (quoting _Chesebrough-Pond's, Inc._

_v. Faberge, Inc._, 666 F.2d 393, 396 (9th Cir. 1981)).  Under the Ninth Circuit's

standard, concrete threats of litigation are not required to demonstrate a reasonable

apprehension of an infringement suit.  _Id._ at 1158.

The right of publicity at issue in this case bears sufficient similarity to the other

forms of intellectual property governed by the "flexible approach" that the same

doctrine must be applied.  Pursuant to the "flexible approach," defendants here

demonstrate the type of fear necessary to proceed on their counterclaims under the

DJA.  This case does not involve only a remote chance of litigation.  To the contrary,

Experience sued defendants (albeit on Lanham Act and state law claims) long before

defendants filed these counterclaims.  Although Experience currently makes no claim

under the WPRA, the specter of an alleged "right of publicity" is evident not only in

the Amended Complaint, but also on Experience's publicly available website.  Thus,

defendants can reasonably postulate that, absent a trademark- or copyright-based

rationale for suing defendants, Experience would likely resort to litigation under the

WPRA.

ORDER - 17

Moreover, as in _Seattle Sch. Dist. No. 1 v. Wash._, 633 F.2d 1338 (9th Cir. 1980), the "circumstances of the dispute provide sufficient guarantees that a genuine case or controversy exists." _Id._ at 1342 n.1.  Like the initiative at issue in _Seattle Sch._, the WPRA is "a highly specific statute," _id._, amended in response to related litigation and dealing directly with the topic in dispute, namely the survivability of a right of publicity.  In addition, the WPRA, as amended in 2008, is "a recent statutory enactment and not a law which has lain moribund for years," a fact the Ninth Circuit found particularly relevant in _Seattle Sch._ _Id._  Finally, in contrast to a criminal statute, the WPRA, as a civil enactment, "imposes an affirmative duty to comply." _Id._  As the Ninth Circuit explained in _Seattle Sch._, the obligation to conform "in and of itself makes [an] attack on the validity of the law a live controversy, and not an attempt to obtain an advisory opinion." _Id._ (quoting _Lake Carriers' Ass'n v. MacMullan_, 406 U.S. 498, 507 (1972)).

Defendants assert that they have created products comporting with the Court's preliminary injunction and nominative fair use analysis, but have been unable to distribute them due to the lack of clarity concerning the extent of Experience's rights in Jimi Hendrix's name and likeness.  The Court concludes that the validity of the WPRA is squarely at issue, and that defendants have shown a sufficient "personal stake in the outcome of the controversy" to establish standing.  _See Phillips Petroleum Co. v. Shutts_, 472 U.S. 797, 804 (1985).

4.     __Due Process Clause / Full Faith and Credit Clause__

Historically, when evaluating the constitutionality of a choice-of-law decision, a more exacting standard was applied under the Full Faith and Credit Clause[9] than under the Due Process Clause.  _See_ _Allstate Ins. Co. v. Hague_, 449 U.S. 302, 308 n.10 (1981); _see also_ _Aldens, Inc. v. Packel_, 524 F.2d 38, 43-44 (3d Cir. 1975) (indicating that the Due Process Clause erects "a rather low threshold of state interest sufficient to justify exercise of the state's sovereign decisional authority with respect to a given transaction," while the Full Faith and Credit Clause requires that a "sister state" not have "a greater interest in regulating the transaction").  The United States Supreme Court, however, has abandoned the previous "balancing of interests" approach, and now recognizes that situations can frequently arise in which application of either the law of one state or the contrary law of another is consistent with both the Due Process Clause and the Full Faith and Credit Clause of the Constitution.  _Franchise Tax Bd. of Cal. v. Hyatt_, 538 U.S. 488, 496 (2003).

The Constitution does not compel a state to substitute the laws of other states for its own on subjects "concerning which it is competent to legislate."  _Sun Oil Co. v._

---

[9] Under the Full Faith and Credit Clause, which provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State," U.S. Const. art. IV, § 1, a distinction is drawn between legislative measures and judgments.  The obligations of the Full Faith and Credit Clause are more rigorous with respect to judgments.  _Baker v. Gen'l Motors Corp._, 522 U.S. 222, 232-33 (1998).  "A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land."  _Id._ at 233.  The instant case concerns statutory provisions, and therefore, the doctrines concerning judgments that have developed under the Full Faith and Credit Clause are not relevant.

*Wortman*, 486 U.S. 717, 722 (1988) (quoting *Pac. Emp'rs Ins. Co. v. Indus. Accident Comm'n*, 306 U.S. 493, 501 (1939)).  Thus, on procedural matters, a state may, but is not required to, apply its own laws even when the related substantive issues are governed by the law of another state.  *Id.* at 727.  For example, in *Wortman*, use of Kansas's statute of limitations with respect to claims arising under Texas, Oklahoma, and Louisiana law did not violate the Due Process or Full Faith and Credit Clauses. *Id.* at 722-30.  In contrast, with respect to the merits of a claim, to satisfy constitutional requirements, the state "must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  *Shutts*, 472 U.S. at 818 (quoting *Allstate*, 449 U.S. at 312-13). Because the WPRA speaks to substantive matters, the statute must satisfy this "significant contact" standard.

   With respect to individuals or personalities domiciled in other jurisdictions, however, Experience does not even attempt to argue that Washington has sufficient interests in their property rights to justify application of Washington law to the issue whether such individuals' or personalities' rights of publicity survive their deaths. Instead, Experience contends that the WPRA governs only infringements occurring within Washington and is therefore within constitutional limits.  Experience's argument ignores both the language of the amended WPRA and the rule of dépeçage, which is applicable in Washington.

The WPRA, as modified, does much more than impose liability for the unauthorized use "of a living or deceased individual's or personality's name, voice, signature, photograph, or likeness, on or in goods, merchandise, or products entered into commerce in this state." RCW 63.60.050. The WPRA purports to govern whether a right of publicity exists, whether it continues post-mortem, and how it may be transferred during life and after death, regardless of where the particular individual or personality is or was domiciled. In addition, although the WPRA requires that allegedly infringing goods, merchandise, or products enter into commerce in Washington, it does not contain a similar restriction concerning infringements occurring in the advertising of goods or services or in fund-raising or solicitation of donations. Rather, the statute defines infringement as unauthorized use in advertising or fund-raising without regard to where such activities transpire, and then separately precludes the dissemination or publication of such advertisements within the State of Washington.[10] Experience's characterization of the WPRA as applying "only to infringements occurring within Washington," Suppl. Briefing at 8 (docket no. 96), is simply not accurate.

---

[10] _See_ RCW 63.60.050 ("Any person who uses . . . a living or deceased individual's or personality's name . . . or likeness . . . for purposes of advertising products, merchandise, goods, or services, or for purposes of fund raising or solicitation of donations, **_or_** if any person disseminates or publishes such advertisements in this state, without written or oral, express or implied consent of the owner of the right, has infringed such right." (emphasis added)). This section of the WPRA was enacted in 1998 and was not amended in 2008.

Moreover, Experience fails to acknowledge that survivability and infringement are distinct issues, and that, under the principle of dépeçage, they may be subject to different choice-of-law decisions.[11]  Although some states do not follow the rule of dépeçage, Washington does.  *See* *Brewer v. Dodson Aviation*, 447 F. Supp. 2d 1166, 1175 (W.D. Wash. 2006) (recognizing that Washington courts might "apply the law of one forum to one issue while applying the law of a different forum to another issue in the same case" (quoting Kelly Kunsch, 1 WASH. PRAC. § 2.21 (4th ed. 1997 & Supp. 2008))); *see also* *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 143, 210 P.3d 337 (2009) (indicating that, having abandoned the lex loci delicti rule, Washington courts now "decide which law applies by determining which jurisdiction has the most significant relationship *to a given issue*" (emphasis added)); *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 25 (Mo. Ct. App. 2004) (observing that the Restatement, which Washington follows, "contemplates that different states' laws may be applied to different issues in the same case").  Thus, contrary to Experience's contention, the WPRA's definition of infringement does nothing to establish the constitutionality of its choice-of-law directive as to survivability.

---

[11] *See* 2 McCarthy on Rights of Publicity § 11:15 ("Even if a court follows the majority rule and determines that the state of domicile at the time of death determines whether there is a post-mortem right of publicity, it may well also decide that the law of the forum determines whether and in what circumstances that right has been infringed. . . .  This is referred to as the principle of 'dépeçage,' whereby the rules of different states are applied to different issues in the case.").

At least one court has explicitly recognized that, although the law of the domicile applies to survivability, the law of the forum might define the elements of infringement. *Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538 (11th Cir. 1983). In *Acme Circus*, the individual or personality at issue was Clyde Beatty, who had operated the Clyde Beatty Circus, but had sold all of his circus equipment, and licensed his and the circus's name, to Acme Circus. Prior to his death, Beatty assigned all of his rights in the circus to his wife. After Beatty passed away, his wife entered into a 10-year licensing agreement with Acme Circus. After the written contract expired and subsequent licensing negotiations failed, Acme Circus sought a declaratory judgment concerning its right to use the name Clyde Beatty. The Eleventh Circuit concluded that, because Clyde Beatty was domiciled in California at the time of his death, the law of California governed whether his right of publicity survived his death.[12] *Id.* at 1541. Because, however, the circus operated out of Florida, and any unauthorized use of Clyde Beatty's name most likely occurred in Florida, the law of Florida would apply to whether "there has been a tortious infringement of the right of publicity." *Id.* at 1546.

---

[12] The Eleventh Circuit interpreted the law of California at the time of the litigation to recognize a post-mortem right of publicity if the name at issue "has been exercised in conjunction with a specific product or business during a lifetime sufficiently to create a secondary meaning in that name and the right to use that name in conjunction with the same product or business has been validly assigned to another." 711 F.2d at 1544 (interpreting *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 603 P.2d 425 (1979)). California subsequently enacted a statute defining in different terms the post-mortem right of publicity. *See Cairns*, 292 F.3d at 1146.

In sum, choice of law is a severable inquiry in Washington, which is performed issue by issue. With respect to the existence of any post-mortem right of publicity, the analysis boils down to whether selection of the forum's law rather than the domicile's law is arbitrary or fundamentally unfair. In the various briefs submitted to the Court, Experience never directly confronts this issue. The question appears, however, to answer itself. In this modern era of fascination with celebrities,[13] many courts have been forced to perform a similar choice-of-law analysis, albeit without the statutory directive present in this case. Virtually all of these courts have applied the law of the domicile to determine whether a right of publicity descended. *See* *Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) (Princess Diana, domiciled in Great Britain); *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) (Ginger Rogers, domiciled in Oregon); *Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538 (11th Cir. 1983) (Clyde Beatty, domiciled in California); *Groucho Marx Prods., Inc. v. Day & Night Co.*, 689 F.2d 317 (2d Cir. 1982) (Marx Brothers, domiciled in California); *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981) (Elvis Presley, domiciled in

---

[13] Crediting Samuel Warren and Louis Brandeis with first articulating the right to privacy, one court has opined that the authors, writing in 1890, "could not have foreseen today's commercial exploitation of celebrities." *Tenn. ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell*, 733 S.W.2d 89, 94 (Tenn. Ct. App. 1987) (citing Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890)). Lamenting that "American culture outgrew [Warren's and Brandeis's] concept of the right of privacy," the same court observed that today's judiciary cannot "be unaware of the manner in which celebrities exploit the public's recognition of their name and image," citing as examples Elvis Presley tee shirts, Hank Williams, Jr. bandannas, Barbara Mandrell satin jackets, shortening used in Loretta Lynn's pie crusts, Tennessee Ernie Ford's insurance, and "the sausage that Jimmy Dean makes." *Id.*

Tennessee); _Shaw Family Archives, Ltd. v. CMG Worldwide, Inc._, 434 F. Supp. 2d 203

(S.D.N.Y. 2006), 486 F. Supp. 2d 309 (S.D.N.Y. 2007), 2008 WL 4127830

(S.D.N.Y.), 589 F. Supp. 2d 331 (S.D.N.Y. 2008) (Marilyn Monroe, domiciled in New

York); _Joplin Enters. v. Allen_, 795 F. Supp. 349 (W.D. Wash. 1992) (Janis Joplin,

domiciled in California); _Se. Bank, N.A. v. Lawrence_, 66 N.Y.2d 910, 489 N.E.2d 744

(1985) (Tennessee Williams, domiciled in Florida); _cf. Prima v. Darden Restaurants,

Inc._, 78 F. Supp. 2d 337 (D.N.J. 2000) (Louis Prima, resident of Nevada) (holding

that, although Louis Prima died in a hospital in Louisiana, his contacts there were

"minuscule," that Louisiana had no governmental interest in the action, that either

Nevada or New Jersey law governed, and that, because no conflict existed, New Jersey

law would be applied). _But see Estate of Elvis Presley v. Russen_, 513 F. Supp. 1339

(D.N.Y. 1981) (holding that, under New Jersey law, Elvis Presley's right of publicity

did not abate upon his passing, even though he was domiciled in Tennessee at the time

of his death).[14]

Not only is Washington's choice-of-law directive at odds with the almost

unanimous views of courts that have grappled with the survivability of the right of

---

[14] In 1980, the Sixth Circuit concluded that Tennessee courts would not treat Elvis Presley's right of publicity as descendible. _Memphis Dev. Found. v. Factors Etc., Inc._, 616 F.2d 956 (6th Cir. 1980). In a subsequent case, the Second Circuit deferred to the Sixth Circuit's interpretation of Tennessee law. _Factors_, 652 F.2d at 283. In 1987, a Tennessee court reached the opposite conclusion, holding that a celebrity's right of publicity survives his or her death. _Crowell_, 733 S.W.2d at 97-99. With this clarification of Tennessee law, no conflict appears to exist now between New Jersey and Tennessee law, and the importance of _Russen_ has diminished.

publicity, it also runs contrary to the traditional approach for resolving the

testamentary or intestate disposition of personal property.  _See_ 2 McCarthy on Rights

of Publicity § 11:17 ("The traditional rule, under both the First and Second

Restatement of Conflicts, for determining the testamentary or intestate disposition of

personal property is to look to the law of decedent's domicile at the time of death.").

This status as an outlier evidences the arbitrariness of the WPRA's choice-of-law

provision and portends of the potential unfair ramifications of its application.  Courts

look to the law of the domicile for a reason.  The domicile has the requisite contacts

with a particular individual or personality to generate a state interest in defining his or

her property rights and how they may be transferred.[15]  To select, as the WPRA

suggests, the law of a state to which the individual or personality is a stranger,

constitutes no less random an act than blindly throwing darts at a map on the wall.[16]

       This capriciousness will likely lead to inconsistent and unjust results.  Indiana is

the only state other than Washington that attempts by statute to disregard the law of

the domicile.  _See_ Ind. Code § 32-36-1-1(a) ("This chapter applies to an act or event

---

[15] Indeed, with regard to estate proceedings, Washington recognizes the importance of such links with the forum, designating as the appropriate venue, in order of preference, the county of the decedent's residence, the county in which any part of the probate estate is situated, the county in which any nonprobate asset is situated, or the county in which the decedent died. RCW 11.96A.050(3).

[16] Any contention that Washington has an interest in curtailing infringements of a right of publicity misses the mark.  An infringement cannot occur unless a right exists.  Washington cannot claim an interest in artificially escalating the amount of infringement by creating illusory rights of publicity.

ORDER - 26

that occurs within Indiana, regardless of a personality's domicile, residence, or citizenship.").[17]  Thus, with respect to a personality who was domiciled in New York at the time of death, Washington and Indiana would stand alone in disregarding New York law abating such personality's right of publicity,[18] and any entity using such personality's likeness for commercial purposes would be subject to contradictory standards.

Efforts to avoid litigation by, for example, restricting sales to the 48 states honoring New York law, would be futile.  Under the WPRA, advertisements alone provide a basis for suit, regardless of whether they are disseminated in the forum.  In addition, putative plaintiffs will be motivated to divert sales to Washington to obtain the benefits of the WPRA.  Finally, under existing case law, specific jurisdiction as to intentional conduct occurring outside the forum may be predicated solely on the "effects" within the forum.  _Calder v. Jones_, 465 U.S. 783, 789-91 (1984); _see_ _Shaw Family Archives_, 434 F. Supp. 2d at 209-10 (observing that defendants did "everything possible not to 'expressly aim' their conduct at Indiana," but concluding that "mere

---

[17] Indiana is the principal place of business and incorporation for CMG Worldwide, Inc., which engages in the licensing for commercial purposes of the names and likenesses of living and deceased celebrities, including Marilyn Monroe.  _Shaw Family Archives_, 434 F. Supp. 2d at 205.

[18] The wisdom of New York's treatment of a celebrity's right of publicity is not at issue in this case.  As observed, however, in connection with Louisiana's similar approach, a state might have a legitimate interest in "the free use by its citizens of dead celebrities' personas." _See_ _Prima_, 78 F. Supp. 2d at 347.  _But compare_ _Crowell_, 733 S.W.2d at 97-99 (articulating five reasons for recognizing a post-mortem right of publicity).

ORDER - 27

economic harm in the forum state is enough for personal jurisdiction"); _see also_ _id._ at

206 (indicating that the promotional, non-transactional website at issue disclaimed in

large print, "[n]o Marilyn Monroe images shall be licensed for sale or distribution in

Indiana or in any jurisdiction that also requires the consent of the right of publicity

holder").

Applying the law of the domicile produces none of these negative

consequences.[19]  An individual or personality can have only one domicile at a given

time.  _Shaw Family Archives_, 2008 WL 4127830 at *10 (quoting _Smith v. Smith_, 45

Cal.2d 235, 239, 288 P.2d 497 (1955)).  The domicile at the time of death is a

constant, based upon which the scope and survivability of any right of publicity may

be derived, even if the law of the domicile is in flux concerning such issues.[20]  Once

---

[19] Advocates of the 2008 amendments to the WPRA expressed concern over the continued
vitality and value of contracts executed in favor of Washington businesses, like Getty Images
and Corbis Corporation, that have acquired or licensed the right to use a celebrity's name or
likeness.  House Report, House Bill 2727, 60th Legislature, 2d Regular Session (Mar. 7,
2008).  Whether the WPRA, notwithstanding its constitutional infirmities, would afford any
protection to these companies remains unclear.  Such entities, however, can independently
manage their risks by encouraging personalities with whom they form agreements to select
favorable domiciles, perhaps negotiating reduced royalties with those domiciled in
jurisdictions in which the right of publicity is not descendible.  They can also reduce their
reliance on any precarious rights of publicity by developing other forms of intellectual
property, like trademark, trade dress, and copyright.

[20] During the course of protracted litigation in two different forums concerning the right of
publicity associated with Marilyn Monroe, California law on the subject underwent
significant changes.  The two suits were between the successors of Lee Strasberg, one of the
sole devisees under Monroe's will, on one hand and, on the other hand, the successors of
photographers Sam Shaw and Milton H. Greene, respectively, who owned copyrights in
famous images of Monroe.  The respective courts initially ruled that California's 1984 statute
creating a descendible right of publicity did not operate to vest such property in Strasberg or
his successors because Monroe, who died in 1962, could not have devised property that did

determined under the law of the domicile in effect at the relevant time, the existence or

absence of a post-mortem right of publicity is known with respect to all jurisdictions,[21]

---

not exist and that, as a consequence, she did not own at the time she passed away.  _Shaw Family Archives_, 486 F. Supp. 2d at 314-17; _see Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc._, 568 F. Supp. 2d 1152, 1156 (C.D. Cal. 2008) (summarizing an earlier ruling).  In response to these holdings, the California legislature amended the statute to give it retroactive effect.  _See Shaw Family Archives_, 589 F. Supp. 2d at 334 (indicating that "[t]he 2007 law was notable for indicating that it was specifically intended to overrule the . . . decision in this action, as well as a decision reaching the same result . . . [in the] California action").  In light of the statutory revision, the court in _Greene_ reconsidered its previous decision, and concluded that, if Monroe had been domiciled in California at the time of her death, her right of publicity might have passed to Strasberg through the residual clause of her will.  _See Greene_, 568 F. Supp. 2d at 1157-58 (recounting procedural history).  In the end, however, Strasberg's successors were judicially estopped from arguing that Monroe was domiciled anywhere other than New York, where her will was probated and where, primarily for tax reasons, her successors had previously asserted she was domiciled at the time of her death.  _Shaw Family Archives_, 2008 WL 4127830 at *18; _Greene_, 568 F. Supp. 2d at 1158-99.

[21] Recent legislative attempts to resurrect already extinguished rights of publicity raise concerns under the Takings Clause.  Indeed, defendants in this case have challenged the retroactive effect of the WPRA as improperly vesting in particular persons or entities certain rights of publicity that previously passed into the public domain.  _Cf. Acme Circus_, 711 F.2d at 1546 n.9 (declining to address a similar takings argument because Clyde Beatty's right of publicity survived his death and his persona never passed into the public domain).  Experience responds that defendants cannot claim any right to property in the public domain.  Defendants, however, are not asserting a right of publicity relating to Jimi Hendrix, with the attendant ability to preclude others from using his name and likeness, and thus, contrary to Experience's suggestion, defendants are not relying on public, as opposed to private, property.  _See_ U.S. CONST. amend. V ("nor shall private property be taken for public use, without just compensation").  Rather, defendants argue that they have created, commissioned, purchased, and/or licensed items bearing Jimi Hendrix's image, and that the commercial values of these original works, which would be eligible for free speech and copyright protection if Jimi Hendrix's persona is in the public domain, are jeopardized by the 2008 amendments to the WPRA.  This contention might represent a viable "as applied" challenge to the WPRA, but it raises factual issues not appropriately resolved on summary judgment.  Experience accuses defendants of comingling nominative fair use materials (_i.e._, images of or by Jimi Hendrix, accompanied by his name) with infringing items (_i.e._, branding similar to Experience's registered marks) to produce works that do not enjoy the guarantees of the First Amendment, the Fifth Amendment, or the Copyright Clause.  Defendants admit that some of their earlier products contained infringing logos and the like, but contend that their current merchandise

and an entity seeking to exploit a persona that has passed into the public domain need not engage in any state-specific self-censorship.  Moreover, adhering to the "majority" domicile-oriented rule would eliminate the incentive for putative plaintiffs to forum shop.  Given the arbitrary and unfair nature of the WPRA's choice-of-law directive concerning the existence of a post-mortem right of publicity, the Court GRANTS partial summary judgment in favor of defendants on their first declaratory judgment counterclaim and hereby DECLARES that such provision violates the Due Process and Full Faith and Credit Clauses of the United States Constitution.[22]

---

does not.  The nature, scope, and timing of defendants' creations remain unclear, and the Court cannot decide, as a matter of law, whether the 2008 amendments to the WPRA, as applied to defendants, effectuate an unconstitutional taking of defendants' property.

[22] During oral argument, counsel for defendants indicated that the constitutional challenges at issue are being presented on only an "as applied," as opposed to a facial, basis.  The Court is not persuaded that this distinction is meaningful in this case.  As observed by Professor Fallon over a decade ago, "[s]ome doctrinal tests call for statutes to be tested on their faces, whereas others do not."  Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1321 (2000).  The constitutional standard that controls in this matter falls squarely in the former category.  Moreover, given the nature of the WPRA's constitutional defect, an "as applied" ruling would, as acknowledged by counsel for Experience, have broad preclusive effect.  As explained by Professor Fallon, "[a] court has no power to remove a law from the statute books.  When a court rules that a statute is invalid -- whether as applied, in part, or on its face -- the legal force of its decision resides in doctrines of claim and issue preclusion and of precedent. . . .   For example, if the Supreme Court concludes that a federal statute is invalid because enacted for a forbidden purpose, the Court's decision has claim- and issue-preclusive effects only with respect to the named parties.  Under the doctrine of precedent, however, the Court's conclusion that the statute is invalid would bind all lower courts in all future cases. . . .  In cases involving rulings by federal courts on the validity of state statutes, matters grow more complex, but the basic point holds.  The binding effect of a federal judgment depends on doctrines of claim and issue preclusion and of precedent.  Within those doctrines, it generally does not matter whether a court purports to hold a statute unconstitutional or merely pronounces that conclusion in ruling on an as-applied challenge."  *Id.* at 1339-40.

ORDER - 30

The Court specifically HOLDS that the following language of the WPRA is unconstitutional:

**RCW 63.60.010, fourth sentence**: "regardless of whether the law of the domicile, residence, or citizenship of the individual or personality at the time of death or otherwise recognizes a similar or identical property right";

**RCW 63.60.010, last sentence**: "regardless of place of domicile or place of domicile at time of death";

**RCW 63.60.020(1)**: "regardless of the individual's place of domicile, residence, or citizenship at the time of death or otherwise";

**RCW 63.60.020(2)**: "regardless of the personality's place of domicile, residence, or citizenship at the time of death or otherwise";

**RCW 63.60.030(1)(a)**: "regardless of whether the law of the domicile of the deceased individual or personality, at the time of death, or thereafter, recognizes a similar or identical property right"; and

**RCW 63.60.030(1)(b)(iv)**: "regardless of whether the law of the domicile of the deceased third party, at the time of death, or thereafter, recognizes a similar or identical property right."

/ / /

/ / /

/ / /

/ / /

ORDER - 31

5.      __Dormant Commerce Clause__[23]

The Commerce Clause, U.S. CONST. art. I, § 8, cl. 3 ("Congress shall have

Power . . . To regulate Commerce . . . among the several States"), has been interpreted

as having a "negative" or "dormant" aspect that denies to the states the authority

vested in Congress.  _See, e.g._, _Black Star Farms LLC v. Oliver_, 600 F.3d 1225, 1230

(9th Cir. 2010).  The dormant Commerce Clause constrains states from engaging in

extraterritorial regulation.  _Healy v. Beer Inst._, 491 U.S. 324, 336 (1989).  _But see_

_Midwest Title Loans, Inc. v. Ripley_, 616 F. Supp. 2d 897, 903 n.4 (S.D. Ind. 2009)

(observing that commentators have questioned whether extraterritorial principles are

---

[23] Defendants make a related challenge under the Privileges and Immunities Clause, U.S.
CONST. art. IV, § 2 ("The Citizens of each State shall be entitled to all Privileges and
Immunities of Citizens in the several States").  The Privileges and Immunities Clause and the
Commerce Clause have a "'mutually reinforcing relationship' stemming 'from their common
origin in the Fourth Article of the Articles of Confederation and their shared vision of
federalism.'"  _Conservation Force, Inc. v. Manning_, 301 F.3d 985, 993 (9th Cir. 2002).  The
analytical framework under each clause, however, is slightly different.  The Privileges and
Immunities Clause is concerned with state laws that distinguish between residents and non-
residents, but only as to "those fundamental rights 'bearing upon the vitality of the Nation as a
single entity,' such as . . . the pursuit of common callings, the ownership and disposition of
privately held property, and access to the courts."  _Id._ at 992 (quoting _Baldwin v. Fish &
Game Comm'n_, 436 U.S. 371, 383 (1978)); _see_ _United Bldg. & Constr. Trades Council of
Camden Cnty. v. Mayor & Council of City of Camden_, 465 U.S. 208, 218-19 (1984).  In
contrast, the dormant Commerce Clause requires no showing that the challenged state
legislation impacts a fundamental right derived from the principles of federalism.  In
presenting their challenge to the WPRA under the Privileges and Immunities Clause,
defendants fail to explain how the rights allegedly burdened by the WPRA are "'fundamental'
to the promotion of interstate harmony," _Camden_, 465 U.S. at 218, or how the WPRA
discriminates against non-residents.  Indeed, defendants' underdeveloped Privileges and
Immunities Clause argument appears to contradict their theory under the Full Faith and Credit
Clause, namely that the WPRA inappropriately treats all individuals and personalities the
same, regardless of domicile.  Thus, the Court declines to further consider defendants'
Privileges and Immunities Clause challenge to the WPRA.

an appropriate outgrowth of the Commerce Clause).  Thus, a state may not apply its

statutes to commerce that "takes place wholly outside of the State's borders, whether

or not the commerce has effects within the State."  _Healy_, 491 U.S. at 336.

Defendants characterize the WPRA as creating a Washington-centered national

right-of-publicity system.  Experience does not and cannot offer much response.[24]  The

WPRA seeks to govern a variety of transactions occurring "wholly outside"

Washington's borders, including right-of-publicity transfers between non-residents via

contract, testamentary device, or intestate succession, and the creation and

dissemination in other forums of advertising incorporating the names or likenesses of

non-domiciliaries.  The Court HOLDS that the choice-of-law directive in the WPRA

relating to the survivability of a right of publicity violates the dormant Commerce

---

[24] Experience organized its arguments around the two-tiered analysis used when discrimination is alleged under the dormant Commerce Clause.  Under this approach, the first inquiry is whether the statute at issue directly regulates interstate commerce, discriminates against interstate commerce, or favors in-state economic interests over out-of-state interests. _Nat'l Collegiate Athletic Ass'n v. Miller_, 10 F.3d 633, 638 (9th Cir. 1993).  If the statute has any of these effects, then it is per se invalid.  _Id._; _see also_ _Or. Waste Sys., Inc. v. Dep't of Envtl. Quality_, 511 U.S. 93, 99 (1994).  If the statute survives this initial scrutiny, then it is analyzed under a balancing test that was first articulated in _Pike v. Bruce Church, Inc._, 397 U.S. 137 (1970).  The _Pike_ standard asks whether the law "regulates even-handedly to effectuate a legitimate local public interest," has only "incidental" effects on interstate commerce, and imposes no burden on such commerce that is "clearly excessive in relation to the putative local benefits."  _Gravquick A/S v. Trimble Navigation Int'l Ltd._, 323 F.3d 1219, 1224 (9th Cir. 2003) (quoting _Pike_, 397 U.S. at 142); _see Or. Waste_, 511 U.S. at 99.  The Court agrees with Experience that the WPRA does not facially discriminate against interstate commerce or favor Washington businesses over out-of-state concerns.  Nothing in the WPRA prohibits a non-inhabitant from initiating suit to vindicate a right of publicity.  Moreover, nothing in the WPRA dictates a different result for residents than for non-residents.  Defendants' dormant Commerce Clause challenge, however, is not predicated on unequal treatment, but rather on improper exportation of state law, and Experience has missed the mark by focusing on an inapplicable standard.

Clause.  Such ruling constitutes an additional and alternative basis for granting partial

summary judgment in favor of defendants on their first declaratory judgment

counterclaim.[25]  The same provisions of the WPRA found to be in violation of the Due

Process and Full Faith and Credit Clauses, as enumerated earlier, are also deemed

unconstitutional pursuant to the extraterritorial doctrine derived from the dormant

Commerce Clause.

/ / /

/ / /

---

[25] The Court declines to rule on defendants' remaining challenges to the WPRA.  Defendants appear to raise a facial challenge under the First Amendment, complaining that the WPRA inappropriately limits the number of copies of original works of fine art that may be created. _See_ RCW 63.60.070(2)(a).  Nothing in the First Amendment, however, inhibits a state from erecting reasonable restrictions on the nonconsensual commercial exploitation of a celebrity's persona.  _See_ _Zacchini v. Scripps-Howard Broad. Co._, 433 U.S. 562 (1977) (holding that the First Amendment does not insulate the media from liability for the unauthorized broadcast of material protected by a right of publicity).  Of course, in "delineating the right of publicity," the state must "accommodate First Amendment concerns." _Rogers_, 875 F.2d at 1004.  The WPRA appears to do so by permitting the nonconsensual use of a persona "in connection with matters of cultural, historical, political, religious, educational, newsworthy, or public interest," as well as in literary, theatrical, or musical works, film, radio, or television programs, news reports, sports broadcasts, and political campaigns, provided that such use does not inaccurately indicate an endorsement by such individual.  RCW 63.60.070(1)&(2)(b).  Given defendants' cursory analysis, the Court does not further consider defendants' facial attack, and draws no conclusion concerning the viability of an "as applied" challenge under the First Amendment.  With regard to the Copyright Clause, U.S. CONST. art. I, § 8, cl. 8, the Court does not construe defendants' arguments as raising either a facial or an "as applied" challenge.  Defendants do not and cannot assert that the WPRA is preempted.  _See_ _Prima_, 78 F. Supp. 2d at 352-53 (federal copyright law "does not preempt claims based on the appropriation of unfixed, non-copyrightable items such as a plaintiff's voice or likeness" (quoting _Jarvis v. A&M Records_, 827 F. Supp. 282, 297 (D.N.J. 1993) (citing _Midler v. Ford Motor Co._, 849 F.2d 460, 462 (9th Cir. 1988)))).  Rather, defendants seem to rely on the Copyright Clause merely to describe the nature of the property they allege was taken without just compensation by the 2008 amendments to the WPRA.

6.   **<u>Collateral Estoppel</u>**

Having concluded that the unconstitutional amendments to the WPRA did not operate to dictate application of Washington law to the issue of whether Jimi Hendrix's right of publicity survived his death, the Court must now turn to the question of whether New York law continues to govern.  Defendants assert that Experience is barred by the doctrine of collateral estoppel (also known as "issue preclusion") from relitigating the applicability of New York law.  Issue preclusion prevents the rehashing of "all 'issues of fact and law that were actually litigated and necessarily decided' in a prior proceeding."  <u>Robi v. Five Platters, Inc.</u>, 838 F.2d 318, 322 (9th Cir. 1988).  For such preclusion to apply, the issue "must have been 'actually decided' after a 'full and fair opportunity' for litigation."  <u>Id.</u>

Experience contends that the choice-of-law issue was not previously litigated in light of the 2008 amendments to the WPRA.  Although Experience correctly indicates that the <u>Foundation</u> case did not preclude Experience from asserting in this action that the 2008 amendments govern and dictate a different result, Experience's argument is of no further avail.  Given the Court's decision invalidating the 2008 choice-of-law directive, the same analysis used in the <u>Foundation</u> case now applies.  Experience had ample opportunity to litigate whether the law of the domicile, <u>i.e.</u>, New York, should control, and the Court can perceive no basis for revisiting its earlier ruling.  Thus, for the reasons articulated in the <u>Foundation</u> case, the Court HOLDS that under New York law, no post-mortem right of publicity associated with Jimi Hendrix exists.

The Court GRANTS partial summary judgment in favor of defendants as to their second declaratory judgment counterclaim, DECLARES that defendants are not constrained by any right of publicity from trading in images or likenesses of Jimi Hendrix, and further DECLARES, for the reasons set forth in the Court's Order dated July 1, 2009, docket no. 27, that use of the names "HENDRIX" or "JIMI HENDRIX" to identify the subject of an image or the author of a particular work of art constitutes nominative fair use of those names or marks.  The Court makes no ruling concerning whether defendants' merchandise containing images or likenesses of Jimi Hendrix infringes intellectual property rights other than the right of publicity, or whether particular uses of the names "HENDRIX" or "JIMI HENDRIX" satisfy the requirements of the nominative fair use defense.

**C.**   **Defendants' State Law Counterclaims**

    **1.**   ***Noerr-Pennington* Doctrine**

Defendants' defamation and tortious interference claims are predicated on five activities:  (i) Experience's letters to Spencer Gifts and others, enclosing a copy of the complaint in this matter; (ii) Experience's issuance of a press release in March 2009; (iii) Experience's letters to Spencer Gifts and others, enclosing a copy of the preliminary injunction, but not the related order in which the Court declined to enjoin any nominative fair uses of the names "HENDRIX" and "JIMI HENDRIX"; (iv) Experience's inclusion of copies of the complaint with subpoenas issued after the

Court's nominative fair use ruling[26]; and (v) Experience's representation to Spencer Gifts that, pursuant to the Court's preliminary injunction, Spencer Gifts could not sell "*any* merchandise from HendrixLicensing or related companies."  Experience asserts immunity as to these activities under a doctrine first recognized in two antitrust cases, *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).  Although the immunity recognized in these two suits was premised on both the Sherman Act and the First Amendment right to petition, *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 890 (10th Cir. 2000), subsequent cases have applied the doctrine outside of the antitrust context, *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) ("we hold that the *Noerr-Pennington* doctrine applies to Theme's state law tortious interference with prospective economic advantage claims"), and have focused solely on the doctrine's First Amendment foundation, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) ("The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of 'the right of the people . . . to petition the Government for a redress of grievances.'").

---

[26] The subpoenas at issue have not been made part of the record, but letters discussing subpoenas issued to Spencer Gifts and one of its vendors were filed in connection with Experience's motion for partial summary judgment.  *See* Ex. F to Shea Decl. (docket no. 65-2 at 19-20 & 26-27).  In one of these letters, counsel for Spencer Gifts requested that "response to the subpoena be waived due to the present voluntary sharing of information."  *Id.*  Counsel for Experience refused, stating that "[o]ur clients require your full compliance with the subpoena."  *Id.*  Given the tenor of this correspondence, the Court infers that the subpoenas were duces tecum, requesting documents and/or information, as opposed to attendance at trial or deposition.

The _Noerr-Pennington_ doctrine insulates from liability "petitioning conduct."
_Theme_, 546 F.3d at 1006.  Petitioning conduct includes the filing of a "reasonably
based but unsuccessful lawsuit," _Sosa_, 437 F.3d at 930, as well as conduct "incidental
to a lawsuit, including a pre-suit demand letter," so long as it does not fall into the
realm of "sham litigation."  _Theme_, 546 F.3d at 1007.  Sham litigation may take one of
three forms:  (i) when the lawsuit is objectively baseless and the motive for bringing it
was unlawful; (ii) when a series of lawsuits are brought "pursuant to a policy of
starting legal proceedings without regard to the merits" and for an unlawful purpose;
and (iii) when a party knowingly commits fraud or makes "intentional
misrepresentations to the court," thereby "depriv[ing] the litigation of its legitimacy."
_Sosa_, 437 F.3d at 938.

In an earlier case, this Court concluded that the third type of "sham litigation" is
limited to fraudulent conduct "to a _court_."  _Modular Arts, Inc. v. Interlam Corp._, 2007
WL 2069862 at *3 n.2 (W.D. Wash.) (emphasis in original).  The Court cited to a case
predating _Sosa_, namely _Kottle v. Nw. Kidney Ctrs._, 146 F.3d 1056 (9th Cir. 1998),
summarizing _Kottle_ as "declining to apply [the third] exception outside the context of
a judicial proceeding."  _Modular Arts_, 2007 WL 2069862 at *3 n.2.  The Court's
earlier interpretation of _Kottle_ appears to have been incomplete.  In _Kottle_, the Ninth
Circuit concluded that the third exception for intentional fraud did not apply in the
legislative context because "the political arena has a higher tolerance for outright lies
than the judicial arena does."  146 F.3d at 1061.  Thus, _Kottle_ does not stand for the

proposition that, in a judicial setting, the misrepresentation at issue must be presented to the court, as opposed to litigants or third parties; _Kottle_ merely recognizes that the ethical standards of attorneys and judges do not apply to individuals lobbying for legislative change.

Clarifying _Kottle_, however, does not resolve the issue.  In _Sosa_, which was also cited by this Court in _Modular Arts_, the Ninth Circuit described the third category of sham litigation with specific reference to "the court," 437 F.3d at 938, seeming to leave no room for addressing bad behavior aimed at third parties occurring in connection with an otherwise meritorious lawsuit.  A different result would be reached, however, under the reasoning of _Cardtoons_, a Tenth Circuit case regarded by the _Sosa_ Court as "an outlier."  437 F.3d at 937.  In _Cardtoons_, the plaintiff produced parody baseball trading cards containing images of major league baseball players.  The plaintiff contracted with a third party, Champs Marketing, Inc. ("Champs"), to print the cards.  The defendant, the Major League Baseball Players Association ("MLBPA"), sent prelitigation cease-and-desist letters to both the plaintiff and Champs.  After receiving the letter, Champs advised the plaintiff that it intended to stop printing the cards.  The plaintiff sought a declaratory judgment that it was not violating the MLBPA's publicity rights, as well as damages for tortious interference with the Champs contract.  The MLBPA asserted _Noerr-Pennington_ immunity.  The Tenth Circuit held en banc that prelitigation threats communicated solely between private parties are not afforded immunity from suit under the right to petition

guaranteed by the First Amendment.  208 F.3d at 891-93.  The Tenth Circuit reasoned

that the MLBPA's letter to Champs threatening suit "was never sent to the

government; did not ask the government for any response or 'redress of grievances';

was not even known to the government prior to [the plaintiff's] declaratory judgment

action against the MLBPA; and did not ever result in any litigation."  _Id._ at 892.

 The Ninth Circuit's reluctance to adopt the Tenth Circuit's analysis is

understandable.  In _Cardtoons_, no contention was made that the cease and desist letters

contained misrepresentations or improper threats.  The _Sosa_ Court apparently viewed

this type of correspondence as a "fruitful exercise of the right of petition" for which

"breathing space" must be preserved.  437 F.3d at 939.  The same cannot be said of

communications with non-parties that convey inaccurate interpretations of the Court's

rulings.  In _Sosa_, however, the Ninth Circuit did not have occasion to consider how

false statements to litigants or third parties, as opposed to a court, might affect the

analysis because the plaintiff in that case declined to argue that the prelitigation letters

sent by the defendant fell within the sham exception to the _Noerr-Pennington_ doctrine.

_Id._ at 938.  Thus, the law in this area remains murky.

 The Court concludes that the third type of "sham litigation" does not require

that misrepresentations be made to the tribunal.  The competing concerns underlying

_Noerr-Pennington_ immunity and its exceptions would not be served by eliminating

liability for false statements made to entities not parties to the litigation.  Although the

"breathing space" necessary for a robust right to petition might naturally extend to the

litigants, both before and during the course of the action, the same cannot be said with regard to those not implicated by the petitioning behavior.  Communications with non-litigants outside the context of discovery requests or trial logistics generally do not advance the proceedings or relate to the "redress of grievances."  Thus, the exercise of the right to petition would not be unduly hampered by holding parties to an ethical standard in their dealings with non-parties.  To decide otherwise would provide carte blanche to engage in a host of business torts veiled as "petitioning conduct."  Such result could not have been contemplated when the _Noerr-Pennington_ doctrine was conceived.

Turning to the activities at issue, the Court rules that Experience is entitled, as a matter of law, to _Noerr-Pennington_ immunity as to the letters enclosing copies of the complaint and the preliminary injunction, and as to the subpoenas, but not with regard to the press release or the directive to Spencer Gifts not to conduct business with defendants.  Defendants appear to concede that Experience's initial distribution of its publicly-filed pleading was an appropriate exercise of the right to petition.  The Court is persuaded that the subsequent mailings are likewise insulated from liability.  Although Experience's failure to include the Court's Order concerning nominative fair use along with the preliminary injunction and subpoenas might have generated a misimpression concerning the status of the litigation, defendants have identified no affirmative fraud or misrepresentation manifested in Experience's cover letters.  Denying _Noerr-Pennington_ immunity because a more complete record was not

ORDER - 41

transmitted would unnecessarily chill the exercise of legitimate "petitioning conduct,"

particularly with respect to subpoenas duces tecum, and the Court declines to do so

absent a stronger showing of wrongdoing.  With regard, however, to the press release

and the oral communications between Experience's attorney and counsel for Spencer

Gifts,[27] the Court is satisfied that a genuine dispute of material fact exists concerning

whether such activities fall within the third type of "sham litigation," thereby

precluding partial summary judgment on the basis of *Noerr-Pennington* immunity.

## 2.    **Merits of State Law Counterclaims**

To establish trade libel or defamation, a plaintiff must show "falsity, an

unprivileged communication, fault, and damages."  *E.g.*, *Mohr v. Grant*, 153 Wn.2d

812, 822, 108 P.3d 768 (2005).  To establish tortious interference with a contractual

relationship or business expectancy, a plaintiff must prove:  (i) the existence of a valid

contractual relationship or business expectancy; (ii) the defendant's knowledge of that

relationship; (iii) an intentional interference inducing or causing a breach or

---

[27] During oral argument, Experience raised for the first time an objection to defendants' evidence concerning discussions with counsel for Spencer Gifts.  Despite ample opportunities prior to the hearing, Experience never moved to strike such evidence, and the Court declines to do so sua sponte.  Moreover, Experience will not be heard to complain that defendants did not present an affidavit or declaration from general counsel for Spencer Gifts when Experience likewise submitted correspondence from Spencer Gifts' retained attorney in lieu of any affidavit or declaration.  *See* Ex. F to Shea Decl. (docket no. 65-2 at 26-27).  Finally, Experience does not, and cannot, contend that "the material cited . . . cannot be presented in a form that would be admissible in evidence," and thus, Experience's objection lacks merit.  *See* Fed. R. Civ. P. 56(c)(2) (2010); *see also* Fed. R. Evid. 801(d)(2) (pursuant to which testimony by general counsel for Spencer Gifts about statements made by counsel for Experience would not constitute hearsay); *cf.* Fed. R. Evid. 613 (supporting a conclusion that an e-mail message by general counsel for Spencer Gifts is a reliable indicator of his anticipated testimony at trial because he could be impeached thereby).

ORDER - 42

termination of the relationship or expectancy; (iv) the defendant's interference had an improper purpose or used an improper means; and (v) resultant damage.  *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997). "Exercising in good faith one's legal interests is not improper interference." *Id.* Experience contends that defendants cannot prove one or more of the elements of each of these counterclaims.  The Court disagrees and concludes that genuine disputes of material fact exist as to every element of defendants' tort counterclaims.

To establish a violation of the CPA, a private plaintiff must prove (i) the defendant engaged in an unfair or deceptive act or practice; (ii) such act or practice occurred within a trade or business; (iii) such act or practice affected the public interest; (iv) the plaintiff suffered an injury to his or her business or property; and (v) a causal relationship exists between the defendant's act or practice and the plaintiff's injury.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785-93, 719 P.2d 531 (1986).  In moving for partial summary judgment on defendants' CPA counterclaim, Experience focuses on defendants' factual allegations relating to the communications between Experience and Spencer Gifts.  If defendants' CPA counterclaim was based solely on these private transactions, Experience would have a valid argument that defendants cannot establish the requisite public interest to ward off summary judgment.  Defendants, however, contend that Experience has publicly proclaimed it is "the sole controlling entity overseeing all aspects and uses of Jimi Hendrix's name, likeness, and image," leaving the public with a misconception

concerning the extent to which Jimi Hendrix's persona is available for commercial use and impacting defendants' ability to conduct business.  Given defendants' theory of the case, the Court DENIES Experience's motion for partial summary judgment as to the CPA counterclaim.

**D.   <u>Plaintiffs' False Designation of Origin Claim</u>**

The Lanham Act imposes civil liability on any person who "on or in connection with any goods or services, or any container for goods, uses in commerce . . . any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).  In this action, Experience asserts that defendants have violated the Lanham Act by using certain song titles and lyrics, for example "PURPLE HAZE," "STONE FREE," and "FOXY LADY," which Experience has not registered as trademarks.

In some circumstances, a film, music, or literary title can have a strong enough secondary meaning to preclude its use in connection with other mediums or merchandise.  *See* J. Thomas McCarthy, 2 Trademarks and Unfair Competition §§ 10:16, 10:17, & 10:18 (4th ed. 2010).  "With the advent of mass-marketing of licensed merchandise marked with the titles and characters of motion pictures and television programs, consumers young and old are accustomed to assuming a licensing link between all such products and the associated movie or television program."  *Id.* at

§ 10:18.  This type of cross-media claim requires a plaintiff to prove:  (i) the infringed work has acquired a secondary meaning such that the public identifies it with the plaintiff; and (ii) similar titles spawn public confusion and the misconception that the plaintiff originated, sponsored, or is associated with the defendant's work.  _Walker v. Time Life Films, Inc._, 615 F. Supp. 430, 439 (S.D.N.Y. 1985); _see also_ _Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V._, 749 F. Supp. 1243, 1252 (S.D.N.Y. 1990). A Lanham Act claim of this nature raises First Amendment concerns because "titles are a form of artistic expression."  _Tri-Star_, 749 F. Supp. at 1252.  In such circumstances, the Court must balance "the public interest in avoiding consumer confusion" against "the public interest in free expression."  _Id._

The parties agree that the song titles and lyrics at issue are identified with Jimi Hendrix.  Experience rests there.  _See_ R. Hendrix Decl. & Exs. 1-10 (docket no. 83).  It provides no indication that the song titles and lyrics are associated with Experience Hendrix, L.L.C. or Authentic Hendrix, LLC, or that the public generally knows or cares which corporate entities own the copyrights in Jimi Hendrix's music and continue to make his work commercially available.  Experience does not contend that defendants market music the public might mistakenly believe was written or performed by Jimi Hendrix, or that consumers might think Jimi Hendrix, who is commonly known to be deceased, is himself sponsoring defendants.[28]

---

[28] Experience complains about defendants' advertising statements indicating that their artwork comes from the "bloodline" family of Jimi Hendrix.  Defendants respond that, although such representations are accurate because Andrew Pitsicalis has long been associated

In contrast, defendants provide evidence that more than a dozen "live" registrations for the mark "PURPLE HAZE" exist, none owned by Experience.  *See* Ex. 1 to Osinski Decl. (docket no. 86-1).  In addition, the United States Patent and Trademark Office ("PTO") website reveals that "FOXY LADY" appears in five "live" registrations, while "STONE FREE" (either alone or in combination with other terms) is the subject of two "live" and two "dead" registrations, likewise not belonging to Experience.  *See* http://tess2.uspto.gov (last visited Jan. 21, 2011).[29]  Thus, although the titles or lyrics might be strongly associated with Jimi Hendrix in the music industry, they do not have the crossover secondary meaning necessary to support a false designation of origin claim.  The Court therefore GRANTS partial summary

with Leon Hendrix, Jimi Hendrix's brother, the "bloodline" claims are no longer being commercially used.  *See* Pitsicalis Decl. at 3 (docket no. 87).  Experience does not appear to base its cause of action for false designation of origin on any remarks concerning Hendrix family affiliation, and the purpose for its "bloodline" discussion is unclear.

[29] The PTO website also indicates that "HIGHWAY CHILE" was described as a service mark in two abandoned applications, that "AXIS: BOLD AS LOVE" contains a phrase (*i.e.*, "BOLD AS LOVE") registered by two different entities for use in connection with apparel, and that "CASTLES MADE OF SAND" involves two terms (*i.e.*, CASTLE and SAND) that appear in some combination in eight "live" registrations or applications.  The only title without matching records in the PTO database is "THE WIND CRIES MARY."  Again, however, no showing has been made that such song title is associated with Experience Hendrix, L.L.C. or Authentic Hendrix, LLC.  With regard to the one remaining title or lyric as to which Experience seeks to hold defendants liable for false designation of origin, namely "FIRE," the PTO shows over 3,500 "live" registrations or applications for the word alone, in combination with other text, letters, numbers, or designs, in an alternate spelling (*e.g.*, PHYRE, FYRE, FIRRE), or in a language other than English (*e.g.*, FUEGO).  The industries in which "FIRE" standing alone is used as a mark range from entertainment services, musical sound recordings, and gaming devices to marketing, women's apparel, common metal alloys, floats for fishing, and chewing gum.  Any contention that the generic word "FIRE" is uniquely associated with Jimi Hendrix or with either Experience Hendrix, L.L.C. or Authentic Hendrix, LLC crosses the boundary into objectively baseless litigation.

judgment in favor of defendants and DISMISSES Experience's false designation of origin claim.

## **Conclusion**

For the foregoing reasons, the Court GRANTS the previously deferred portions of defendants' motion for partial summary judgment, docket no. 67.  Declaratory judgments are AWARDED in favor of defendants as described in this Order, and plaintiffs' claim for false designation of origin is DISMISSED with prejudice.  The Court further GRANTS IN PART and DENIES IN PART plaintiffs' motion for partial summary judgment, docket no. 64.  Plaintiffs, as counterclaim defendants, are entitled to *Noerr-Pennington* immunity as to some, but not all, of their "petitioning" activities.  Plaintiffs' motion for partial summary judgment is otherwise DENIED.

IT IS SO ORDERED.

DATED this 8th day of February, 2011.

Thomas S. Zilly
United States District Judge

ORDER - 47