UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EXPERIENCE HENDRIX, L.L.C., a
Washington Limited Liability Company, and
AUTHENTIC HENDRIX, LLC, a
Washington Limited Liability Company,

                    Plaintiffs,

v.

HENDRIXLICENSING.COM, LTD, dba
HENDRIX ARTWORK and
HENDRIXARTWORK.COM, a Nevada
Corporation, and ANDREW PITSICALIS
and CHRISTINE RUTH FLAHERTY,
husband and wife,

                    Defendants.

No. C09-285Z

ORDER

THIS MATTER comes before the Court on defendants' motion for judgment as a matter of law or alternatively new trial, docket no. 152, and plaintiffs' motion for treble damages and attorney fees, docket no. 147. Having reviewed all papers filed in support of, and in opposition to, each motion, the Court enters the following Order.

**<u>Background</u>**

Plaintiffs Experience Hendrix, L.L.C. and Authentic Hendrix, LLC do not have any rights in Jimi Hendrix's name or likeness (in other words, they lack any "rights of

ORDER - 1

publicity"),[1] but they do own various trademarks incorporating the legendary performer's name, image, signature, song titles, and/or lyrics. Defendants used one or more of these federally-registered marks on products bearing Jimi Hendrix's image or art he created, which defendants marketed through websites with "HENDRIX" in the domain names. By Order entered on May 19, 2010, docket no. 57, the Court granted partial summary judgment in favor of plaintiffs, holding that defendants' use of plaintiffs' word mark "HENDRIX" in their business names and website addresses (URLs), and defendants' use of "headshot" and "signature" logos that are similar to plaintiffs' marks, constituted trademark infringement. With regard to defendants' uses of the names "Hendrix" or "Jimi Hendrix" to identify the person depicted in, or the person who authored, the associated images displayed on defendants' products, plaintiffs did not move for summary judgment and the Court made no ruling concerning whether defendants are insulated from liability under the nominative fair use doctrine. *See* Order at 5 (docket no. 57) (indicating that plaintiffs reserved the issue for trial); Order at 3-10 (docket no. 27) (discussing the nominative fair use doctrine).

By Order entered on February 8, 2011, docket no. 105, the Court granted partial summary judgment in favor of defendants, holding that portions of the Washington Personality Rights Act, RCW Chapter 63.60, as amended in 2008, relating to the survivability of the right of publicity for an individual or personality domiciled outside Washington at the time of death, are unconstitutional. The Court declared that defendants are not constrained by any right of publicity from trading in images or likenesses of Jimi Hendrix and that the use of the names "Hendrix" or "Jimi Hendrix" to identify the subject of an image or the author of a particular work of art constitutes nominative fair use of those names or marks. Order at 36 (docket no. 105). For unrelated reasons, the Court

---

[1] Jimi Hendrix died intestate, while domiciled in New York, where the right of publicity does not survive post-mortem. *See* Order at 2 (docket no. 105); Order at 2 (docket no. 27) (citing *Experience Hendrix, L.L.C. v. The James Marshall Hendrix Found.*, Order (C03-3462Z, docket no. 47), *aff'd*, 240 Fed. Appx. 739 (9th Cir. 2007)).

ORDER - 2

dismissed plaintiffs' claim for false designation of origin, and the Court denied, for the most part, plaintiffs' motion for summary judgment as to defendants' state law counterclaims.

The parties subsequently resolved defendants' state law counterclaims, *see* Stipulation and Order (docket no. 110), and the case proceeded to jury trial on only three issues: (i) damages for trademark infringement; (ii) defendants' liability for violation of Washington's Consumer Protection Act ("CPA"); and (iii) upon a finding of liability, actual damages for the CPA violation. Trial lasted a little over three days. With respect to damages for trademark infringement, the jury was instructed that plaintiffs would be entitled to any actual damages proven by plaintiffs by a preponderance of the evidence, as well as any profits of defendants that are attributable to the infringement. Instruction No. 13 (docket no. 139). The jury was further instructed that actual damages may consist of lost profits that plaintiffs would have earned but for defendants' infringement and that such profits are determined by deducting all expenses from gross revenue. *Id.*

As to damages under the CPA, the jury was instructed that only actual damages proximately caused by violation of the CPA could be awarded. *Id.* The jury was also instructed that such actual damages could include injury to reputation, injury to goodwill, and lost profits. *Id.* Finally, the jury was admonished that any award of damages had to be based on the evidence and "not upon speculation, guesswork, or conjecture." *Id.* After the jury had deliberated for approximately three hours, the jury asked for definitions of the terms "injury to reputation" and "injury to goodwill." Jury Question (docket no. 143). After consulting with counsel, the Court explained to the jury that "reputation and goodwill are essentially the same thing" and are collectively "a business's reputation, patronage, and other intangible assets that are considered when appraising a business." Tr. at 91:18-22, Ex. A to Motion (docket no. 152-1); *see also Trovan, Ltd. v. Pfizer, Inc.*, 2000 WL 709149 at \*9 n.10 (C.D. Cal. May 24, 2000) ("In this case, 'goodwill' and 'reputation' are synonymous. 'Reputation' refers to '[t]he esteem in which a *person* is held by others.' Plaintiffs, as business entities, do

1  not have a 'reputation' per se, but rather have 'goodwill' - which is defined as a 'business's
2  reputation, patronage and other intangible assets that are considered when appraising the
3  business.'" (alteration and emphasis in original, citation omitted)).

4       The jury deliberated for roughly another half hour and rendered a verdict in favor of
5  plaintiffs, awarding the following amounts:

| | | |
|---|---|---|
| Infringement | Actual Damages (Lost Profits) | $306,650 |
| | Defendants' Profits | $ 60,000 |
| CPA Violation | Injury to Reputation | $750,000 |
| | Injury to Goodwill | $300,000 |
| | Lost Profits | $306,650 |

12  Verdict (docket no. 146). Defendants now move for judgment as a matter of law or new trial
13  as to the actual damages on the infringement claim, as well as all damages awarded under the
14  CPA, arguing that such amounts are unsupported by the evidence and based purely on
15  speculation. Defendants do not challenge the award of defendants' profits attributable to
16  infringement pursuant to the Lanham Act, 15 U.S.C. § 1117(a), or the finding of liability
17  under the CPA. Meanwhile, plaintiffs move for treble damages under the CPA, up to the
18  $10,000 maximum applicable for acts occurring before July 26, 2009,[2] and for attorney fees
19  under both the Lanham Act, which requires a finding that the case is "exceptional," and the
20  CPA.

21  **Discussion**

22  **A.   Judgment as a Matter of Law**

23       If, after a party has been fully heard on an issue during a jury trial, the Court
24  concludes that a reasonable jury would not have a legally sufficient evidentiary basis to find
25  for the party on that issue, the Court may direct the entry of judgment as a matter of law

---

[2] The CPA was amended, effective July 26, 2009, to raise the cap for treble damages from $10,000 to $25,000. Laws of 2009, ch. 371 § 1 (codified in RCW 19.86.090).

ORDER - 4

against such party. Fed. R. Civ. P. 50(b)(3).[3]  On a Rule 50(b) motion, the Court's inquiry is whether the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, which is contrary to the jury's verdict. *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004).  If the Court grants a Rule 50(b) motion, the Court must also conditionally rule on whether, if the judgment as a matter of law is subsequently vacated or reversed, a new trial should be granted pursuant to Rule 59. Fed. R. Civ. P. 50(c)(1).

1. **Lost Profits**[4]

To support their claim of lost profits, plaintiffs rely entirely on two exhibits, namely Exhibits 60 and 60A (docket nos. 153-1 & 153-2), and the related testimony of Robert Franklin Hendrix, one of the members of Experience Hendrix, L.L.C.  Exhibit 60 lists income by source and year for the period from January 2006 to December 2009.  Exhibit 60A narrows the data from Exhibit 60 to five specific sources of income, and shows the amount received from each vendor, by year, from 2006 to 2009.  Mr. Hendrix testified that

---

[3] To present a motion for judgment as a matter of law after the jury renders a verdict, the movant must also have made a motion for judgment as a matter of law before the case was submitted to the jury. *See* Fed. R. Civ. P. 50(a) & (b); *see also Equal Emp't Opportunity Comm'n v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  A renewed Rule 50(b) motion for judgment as a matter of law is limited in scope to the grounds asserted in the pre-deliberation Rule 50(a) motion. *Go Daddy*, 581 F.3d at 961.  Although plaintiffs in this matter do not dispute that defendants satisfied the procedural prerequisite of moving under Rule 50(a) before the jury began deliberations, plaintiffs assert without any citation to the record that defendants did not earlier present all of the challenges now being made in their Rule 50(b) motion. *See* Response at 4 n.1 (docket no. 153) (accusing defendants of failing to contest plaintiffs' entitlement to "goodwill or lost profits damages").  Having reviewed the relevant portion of the trial transcript, the Court is satisfied that defendants adequately raised in their oral Rule 50(a) motion each of the arguments made in their post-trial motion.  Tr. at 24 (docket no. 159); *see also id.* at 13-15 & 17-23.

[4] Under the Lanham Act, the Court has some discretion in fashioning a plaintiff's remedies.  If the Court finds that the amount of recovery based on a defendant's profits is either inadequate or excessive, the Court may "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).  The Court may also increase the amount of actual damages, by a maximum factor of three, but is not explicitly authorized by the Lanham Act to reduce such award. *Id.*; *see Go Med. Indus. Pty., Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1274 (9th Cir. 2006) ("§ 1117 does not allow for a downward adjustment of actual damages").  Likewise, the CPA permits the Court to treble, but not to decrease, the amount of actual damages.  RCW 19.86.090.  Thus, with respect to defendants' challenge to the lost profits at issue, the Court is guided solely by the doctrines applicable to motions brought under Rules 50 and 59. *See Nat'l Prods., Inc. v. Gamber-Johnson LLC*, 734 F. Supp. 2d 1160, 1164 (W.D. Wash. 2010).

ORDER - 5

1  these five vendors were segregated from other sources of income to focus on licensees who
2  distribute apparel and posters using plaintiffs' marks, representing 35 to 40 percent of
3  plaintiffs' total licensing revenue, and to separate musical products, like foot pedals and
4  guitars.  Tr. at 41:10-24, Ex. A to Motion (docket no. 152-1).  In other words, Exhibit 60A
5  contains information about licensing revenues per annum for merchandise similar to
6  defendants' infringing products.

7  Exhibit 60A shows that the aggregate income from the five licensees listed dropped
8  from $514,773 in 2008 to $116,526 in 2009, which represents a 77.4 percent decrease.
9  Mr. Hendrix testified that the Licensing Industry Merchandisers' Association ("LIMA"), an
10 organization to which Experience Hendrix, L.L.C. belongs, had reported a 5.6 percent
11 decrease in sales across the industry for the same period due to the recession.  Tr. at 36:6-7,
12 36:21-22, 44:2-5, Ex. A to Motion (docket no. 152-1).  Mr. Hendrix further testified, without
13 any explanation, that 77 percent of the reduction in revenue from 2008 to 2009 was caused
14 by "confusion" arising from defendants' infringing use of logos similar to plaintiffs' marks.
15 *Id.* at 49:9-14.  The jury's award of $306,650 in lost profits reflects exactly 77 percent of the
16 $398,247 difference in revenue from 2008 to 2009 for the five sources of income identified
17 in Exhibit 60A.

18 The jury's verdict as to lost profits is unsupported by the evidence for two separate
19 reasons.  First, as implicitly acknowledged by Mr. Hendrix, the similar decline in revenues
20 for plaintiffs' "music folios" cannot be attributed to defendants' infringement because
21 defendants did not distribute similar merchandise or compete in those areas of commerce.
22 Tr. at 41:17-24, Ex. A to Motion (docket no. 152-1).  From 2008 to 2009, income for music
23 and other (non-apparel) merchandise dropped from $1,334,281.93 to $622,316.01,
24 representing a 53.4 percent reduction.  *See* Ex. 60 (docket no. 153-1 at 5-6) (domestic royalty
25 income); Ex. 60A (docket no. 153-2) (licensing revenue for apparel and posters).  Thus, the
26 decline in revenue that could be attributed to defendants' use of plaintiffs' marks is, at most,

ORDER - 6

the difference between the drop for apparel and posters (77.4%) and the reduction for other merchandise (53.4%), or 24 percent.

Second, even if a 24-percent decrease in income were attributable to defendants' infringing behavior,[5] plaintiffs presented no evidence concerning their expenses, which must be deducted from gross revenue to arrive at an amount that can be awarded as lost profits. *Distillers Distrib. Corp. v. J.C. Millett Co.*, 310 F.2d 162, 163-64 (9th Cir. 1962) ("In awarding damages for loss of profits, net profits and not gross profits are the proper measure of recovery."). In response to defendants' post-trial motion, plaintiffs argue that, because their overhead was fixed, their income constituted net profits. Plaintiffs did not present any evidence at trial to support their contention that overhead was fixed,[6] and the three cases on which they rely are not on point.

---

[5] The evidence presented by plaintiffs actually undermines their contention that their loss of royalties on apparel and posters was attributable to defendants' activities. As indicated in Exhibit 60, "image use" revenue dropped dramatically from $197,400 in 2006 to $77,250 in 2007, a 60.9 percent reduction. This decrease cannot be linked to defendants' infringing behavior, which did not commence until sometime in 2008. Instead, the sharp decline is best explained as the expected result of judicial rulings concerning plaintiffs' lack of exclusive rights in Jimi Hendrix's name and likeness. The Ninth Circuit's decision affirming this Court's conclusion that, under New York law, Jimi Hendrix's right of publicity did not survive his death, was issued in June 2007. *See* 240 Fed. Appx. at 739. In the following year, when plaintiffs could no longer exact royalties for use of non-copyrighted images of Jimi Hendrix, plaintiffs' income fell another 63 percent to $28,552.23. In 2009, image use accounted for only $20,192.63 in royalties, representing only 10 percent of the revenue generated in 2006. Given the strong correlation between the reduction in image use royalties and the judgments adverse to plaintiffs, the Court is not persuaded that plaintiffs have sufficiently excluded causes other than defendants' infringement as the reason for their loss of licensing royalties on apparel and posters, which essentially generate revenue by using Jimi Hendrix's likeness. *See Polar Bear*, 384 F.3d at 708 (in the context of an analogous copyright doctrine, "reaffirm[ing] the principle" that a plaintiff bears the burden of proving the causal link between infringement and actual damages).

[6] In arguing that overhead should not be deducted, plaintiffs suggest that their overhead would have been the same regardless of whether their licensees sold 100 items or 100,000 items. Response at 17 (docket no. 153). Whether or not this assertion is accurate, the fact remains that plaintiffs presented no evidence at trial on the subject. Moreover, plaintiffs' analysis is flawed. Overhead cannot be disregarded simply because it might generate a range of business volumes. If fewer sales and less income are generated, then a higher expense per unit and lower profits are realized. In other words, the overhead might be fixed, but the profit margin will vary depending on revenue, and plaintiffs' contention that, in the licensing royalty context, gross and net income are equivalent has no merit.

ORDER - 7

All three cases cited by plaintiffs involved damages for breach of contract, and did not address lost profits in the context of either trademark infringement or violation of the CPA. *Distillers*, 310 F.2d at 163 (breach of contract prevented wholesaler from selling 2,350 cases of the "Calvert" line of alcoholic beverages); *Edwin K. Williams & Co. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053 (9th Cir. 1976) (breach of contract relating to the sale and marketing of record-keeping systems and books tailored for gasoline service stations); *Coast Trading Co. v. Parmac, Inc.*, 21 Wn. App. 896, 587 P.2d 1071 (1978) (breach of contract between commodities wholesaler and specialty equipment manufacturer for the construction of grain tanks).

In addition, in all three cases, evidence about expenses was considered by the fact-finder in calculating actual damages, which belies plaintiffs' contention that these cases somehow relieved them of any burden to put forward evidence concerning overhead. For example, in *Distillers*, in calculating lost profits, the court took into account certain items of overhead, namely discounts to purchasers and commissions to salespersons.[7] 310 F.2d at 163; *see id.* at 163-64 ("net profits and not gross profits are the proper measure of recovery"). Likewise, in the two other cases cited by plaintiffs, overhead was factored in when computing lost profits. *See Edwin K. Williams*, 542 F.2d at 1062 (deducting from amount of lost book sales the 30-percent commission owed under the contract at issue); *Coast Trading*, 21 Wn. App. at 909 (subtracting from the contract price for undelivered grain tanks "all direct costs of labor and materials which would have been expended in performance,

---

[7] In *Distillers*, one component of overhead was disregarded, namely operating expenses, in light of testimony that operating expenses were fixed and would not have been substantially reduced due to the loss of sales of the "Calvert" products at issue. 310 F.2d at 164. Based on this uncontradicted testimony, the court in *Distillers* concluded that operating expenses would not have increased had the contract at issue not been breached. *Id.* In contrast, in the case before the Court, no testimony was given concerning whether plaintiffs' overhead was fixed or was affected by the loss of licensing revenue. Plaintiffs proffered no evidence regarding the types of operating expenses they incurred or whether and to what extent their amounts of overhead fluctuated from year to year.

ORDER - 8

including so-called 'burden' or overhead").[8] Thus, the cases on which plaintiffs rely support, rather than undermine, defendants' challenge to the jury's award of lost profits.

For the foregoing reasons, the Court concludes that the evidence, when construed in the light most favorable to plaintiffs, permits only one reasonable conclusion, which is contrary to the jury's verdict concerning lost profits. Having entirely failed to carry their burden of proving expenses, plaintiffs are not entitled, as a matter of law, to an award of lost profits. Defendants' Rule 50(b) motion is therefore GRANTED as to lost profits under both the Lanham Act and the CPA.

## 2. Injury to Reputation or Goodwill

Defendants challenge the jury's awards of $750,000 for injury to reputation and $300,000 for injury to goodwill on two grounds: (i) as inconsistent with the Court's instruction, answering a question from the jury, that for a business entity, "reputation and goodwill are essentially the same thing," Tr. at 91:18-19, Ex. A to Motion (docket no. 152-1); *see id.* at 89:6-7 ("synonymous"); and (ii) as unsupported by any evidence and merely the product of speculation, guesswork, or conjecture. In response, despite having waived any objection to the Court's supplemental instruction to the jury, *see* Tr. at 90:6

---

[8] Plaintiffs' reliance on *Coast Trading* is particularly misplaced. In *Coast Trading*, the issue on appeal was the trial court's reduction from lost profits ($80,000) of the amount of overhead allegedly saved when the grain tank manufacturer was relieved of performance ($72,189), resulting in a damage figure of only $7,811. 21 Wn. App. at 909. In disapproving of this reduction, the appellate court observed that the evidence did not indicate and the trial court did not find that the loss of the grain tank order caused either a major reduction in work force or a plant shutdown. *Id.* at 911. Instead, personnel were diverted to other projects within the facility and the manufacturer derived no overhead savings from nonperformance of the contract. *Id.* Thus, the proper measure of damages was $80,000, representing the net income that would have been generated by constructing the grain tanks. In summarizing *Coast Trading* as standing for the proposition that fixed overhead should not be subtracted when computing lost profits, plaintiffs ignore the distinction between expenses incurred in producing revenue and costs potentially saved when sales or business is lost, for example by a decrease in the size or capacity of a manufacturing facility or sales force. As recognized in *Coast Trading*, lost profit is by definition the amount that would have been generated but for the breach, infringement, or other alleged misdeed, minus the amount that would have been expended in creating the gross revenue. Plaintiffs have offered no evidence concerning the latter figure, which might reasonably be expected to include attorney fees for drafting licensing agreements, advertising and other marketing expenses, and a proportionate share of commissions and/or salaries for personnel responsible for negotiating with and then policing licensees. These are the items of expense that defendants correctly assert are missing from the evidence adduced at trial. *See* Motion at 6-8 (docket no. 152); Reply at 9 (docket no. 157).

ORDER - 9

(docket no. 152-1); *see also* Fed. R. Civ. P. 51(c), plaintiffs contend that reputation is distinct from goodwill, citing *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 858 P.2d 1054 (1993),[9] and *Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 554 P.2d 1041 (1976).  *See* Response at 18-21 (docket no. 153).  Both of these cases, however, involved individuals (namely, a physician and a victim of an unfair credit report), not businesses, and neither opinion addressed how reputation compares with goodwill.

Moreover, contrary to plaintiffs' position, Washington courts have consistently defined reputation as merely one component of a business's goodwill.  *See, e.g.*, *In re Marriage of Zeigler*, 69 Wn. App. 602, 607, 849 P.2d 695 (1993) ("Goodwill represents the expectation of continued patronage based upon such intangibles as location, trade name, reputation, organization and established clients."); *J.L. Cooper & Co. v. Anchor Sec. Co.*, 9 Wn.2d 45, 54, 113 P.2d 845 (1941) (goodwill "comprises those advantages which may inure to the purchaser from holding himself out to the public as succeeding in an enterprise which had been conducted in the past with the name and repute of his predecessor").  Similarly, Washington's Department of Labor and Industries has explained by way of regulation that goodwill is "the value of a trade or business based on expected continued customer patronage due to its name, reputation, or any other factor."  WAC 296-17-31030(3); *see also Orca Logistics, Inc. v. Dep't of Labor & Indus.*, 152 Wn. App. 457, 216 P.3d 412 (2009) (relying on *inter alia* WAC 296-17-31030(3) in concluding that trucking

---

[9] Plaintiffs also infer from *Fisons* that minimal evidence can support a million-dollar award of damages for injury to reputation.  The *Fisons* Court, however, took care to observe that an appellate court "does not engage in exactly the same review as the trial court because deference and weight are also given to the trial court's discretion in denying a new trial on a claim of excessive damages."  122 Wn.2d at 330.  In *Fisons*, the reputation damages were premised on press reports about the plaintiff's alleged medical malpractice and on plaintiff's testimony that "other physicians had been ignoring him," "he no longer enjoyed his practice," and he "had taken steps to find administrative work."  *Id.* at 331.  Observing that "[d]amages for loss of professional reputation are not the type of damages which can be proved with mathematical certainty," the *Fisons* Court emphasized both "the narrow standard of review" and "the deference accorded to both the jury's discretion and the trial court's refusal to overturn the award" in reaching the conclusion that the evidence adduced at trial was sufficient to sustain the jury's million-dollar award.  *Id.* at 332.  Unlike in *Fisons*, in this case, the Court is not constrained by the deference owed to an initial reviewer of a jury's verdict, and the Court declines plaintiffs' invitation to use for calibration purposes the quantum of proof described in *Fisons*.

ORDER - 10

company was liable for workers' compensation insurance premiums that had not been paid by its predecessor, from which it had acquired tangible assets, goodwill, customer lists, and personnel).

Thus, the Court's unchallenged supplemental instruction to the jury that reputation and goodwill are synonymous comports with Washington law, as well as the observation by a district court in our circuit that business entities do not have reputations per se, but rather have goodwill. *See Trovan*, 2000 WL 709149 at *9 n.10; *see also Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009) (in considering a motion for judgment as a matter of law, courts apply "'the law as it should be, rather than the law as it was read to the jury,' even if the party did not object to the jury instructions"). The jury's verdict awarding vastly different amounts for injury to reputation and injury to goodwill cannot be reconciled with the Court's instruction that, for a business, reputation and goodwill are the same thing.

If these duplicative awards were supported by substantial evidence,[10] the Court would face the difficult task of crafting an appropriate remedy, whether it be striking one award in favor of the other, offering plaintiffs the option of either accepting a remittitur or submitting to a new trial, *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983), or simply requiring a new trial. The Court need not, however, engage in such analysis because the damages at issue are based entirely on speculation. The jury was provided no evidence from which it could determine the diminution in value, if any, of plaintiffs' goodwill as a result of defendants' violation of the CPA. Plaintiffs proffered no estimate, by way of expert testimony or otherwise, of the value of their goodwill either before or after defendants' wrongful conduct. *See Stewart & Stevenson Servs., Inc. v. Pickard*, 749 F.2d 635, 649 (11th Cir. 1984) ("It is axiomatic that the measure of damage to business property, such as

---

[10] As the quantum of proof required to support a jury verdict, substantial evidence means "more than a mere scintilla" and must be comprised of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wash. v. United States*, 214 F.2d 33, 41 (9th Cir. 1954) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Nat'l Prods.*, 734 F. Supp. 2d at 1164.

ORDER - 11

goodwill, is based on a measurement of the difference in value of the property before and after the injury."). Indeed, plaintiffs' counsel conceded during discussions concerning the related jury instructions that "[t]here's not a specific number in evidence." Tr. at 23:17-18 (docket no. 159).[11]

To the extent plaintiffs are contending that goodwill is not capable of being evaluated to a reasonable degree of certainty, Washington law contradicts them. Indeed, Washington courts have recognized five different methods for determining the value of goodwill. *See In re Marriage of Hall*, 103 Wn.2d 236, 692 P.2d 175 (1984). These formulas are not exclusive of other means for evaluating the goodwill of a business, and a particular approach need not be used in isolation. *Id.* at 245; *see also Lewis River Golf, Inc. v. O.M. Scott & Sons*, 120 Wn.2d 712, 845 P.2d 987 (1993). The first of these methods, one of three recognized accounting formulas,[12] capitalizes average net profits and subtracts the book value of tangible assets to arrive at an estimate of goodwill. *Hall*, 103 Wn.2d at 243-44. Another approved method establishes the value of goodwill by determining "what fair price would be obtained in the current open market" if the business were sold. *Id.* at 244. Either of these approaches could have been used in this case.[13] Plaintiffs, however, presented no analytical framework for determining the worth of their goodwill, and they proffered no

---

[11] In their response to defendants' Rule 50(b) motion, plaintiffs quote portions of the trial testimony of three witnesses, namely Robert Hendrix, John McDermott, and Richard F. Yalch, Ph.D. None of these witnesses, however, quantified plaintiffs' goodwill or its alleged diminution in worth. Mr. Hendrix merely described reductions in royalties, drawing no link to any goodwill injuries, while Mr. McDermott and Professor Yalch spoke only in general terms about the meanings ("official," "authentic," "quality") associated with plaintiffs' marks and the anticipated effects of competing uses of confusingly similar marks.

[12] The other two accounting formulas (known as the capitalization of excess earnings method and the IRS variation) are more suited to a professional practice than to a commercial business, and thus, will not be further discussed.

[13] The fifth valuation method described in *Hall* relies on a recent actual sale, an unexercised option, or a contractual formula as might appear in a partnership agreement or the like. Whether this approach might have been applicable remains unclear because copies of plaintiffs' limited liability company agreements were never offered into evidence or provided to the Court.

ORDER - 12

evidence from which the jury could have found that the value of their goodwill had been diminished in any amount.

For the foregoing reasons, the Court concludes that the jury's awards for injury to reputation and injury to goodwill are contrary to the Court's instructions and unsupported by the evidence. The jury's verdict as to these items of damage can only be based on speculation, guesswork, and/or conjecture. Defendants' Rule 50(b) motion is therefore GRANTED.

**B.     New Trial**

Pursuant to Rule 50(c)(1), the Court conditionally rules that, if this Order granting defendants' Rule 50(b) motion for judgment as a matter of law is subsequently reversed or vacated, the Court GRANTS a new trial under Rule 59. A lesser showing is required for a new trial than for a directed verdict or judgment as a matter of law. *See Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Although substantial evidence to support the verdict will defeat a Rule 50 motion for judgment as a matter of law, it will not preclude the Court from granting a Rule 59 motion for a new trial if the verdict is against the clear weight of the evidence. *Id.* Moreover, unlike when a movant seeks to set aside the verdict, on a motion for new trial, the Court need not view the evidence in the light most favorable to the opposing party. *Id.* Indeed, the Court may even weigh the evidence and assess the credibility of the witnesses. *Id.* The question for the Court is whether, after giving "full respect to the jury's findings," it is left with "the definite and firm conviction that a mistake has been committed," in which event the Court is expected to grant a new trial. *Id.* at 1371-72 (quoting 11 C. Wright & A. Miller, FED. PRAC. & PROC. § 2806, at 48-49 (1973)).

For the same reasons the Court has granted defendants' motion for judgment as a matter of law, the Court concludes that the verdict, to the extent it awards lost profits and damages for injury to reputation and goodwill, is against the clear weight of the evidence and the product of speculation, error, and disregard of the Court's instructions. Thus, if the

ORDER - 13

Court's Order pursuant to Rule 50(b) is later reversed or vacated, the Court GRANTS defendants' alternative motion for a new trial.

**C.     Treble Damages**

Plaintiffs seek treble damages under the CPA, but not under the Lanham Act. Under the CPA, treble damages cannot be awarded in the absence of actual damages. *See Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 855 & n.21, 792 P.2d 142 (1990) (citing *St. Paul Fire & Marine Ins. Co. v. Updegrave*, 33 Wn. App. 653, 660, 656 P.2d 1130 (1983)); *see also Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 565, 825 P.2d 714 (1992). Given the Court's ruling on defendants' motion for judgment as a matter of law, setting aside the jury's award of actual damages under the CPA, plaintiffs are not entitled to treble damages. In addition, even if plaintiffs had proven some amount of actual damages under the CPA, the Court would decline to exercise its discretion to increase the award. *See* RCW 19.86.090. The Court therefore DENIES plaintiffs' motion for treble damages.

**D.     Attorney Fees**

Under the Lanham Act, attorney fees may be awarded to a prevailing party, but only in an "exceptional" case. 15 U.S.C. § 1117(a). The "exceptional" requirement is construed narrowly. *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990 (9th Cir. 2008). A case may be considered "exceptional" when the infringement at issue was malicious, fraudulent, deliberate, or willful, or when a party's case is groundless, unreasonable, vexatious, or pursued in bad faith. *See id.*; *see also TrafficSchool.com, Inc. v. eDriver Inc.*, --- F.3d ---, 2011 WL 3198226 at *8 (9th Cir. July 28, 2011). The Court does not find this case "exceptional" within the meaning of § 1117(a).

Plaintiffs' contentions that defendant Andrew Pitsicalis knew about plaintiffs' trademarks from prior litigation and did not consult with a trademark attorney before using the business and domain names and logos at issue prove nothing. Knowledge about a competitor's business and failure to seek a lawyer's advice are as consistent with innocent

ORDER - 14

behavior (*e.g.*, attempts to avoid confusing similarity between trademarks, efforts to save expenses for a fledgling enterprise) as with the type of misconduct warranting an award of attorney fees.  Plaintiffs' further assertion that Mr. Pitsicalis did not fully comply with the preliminary injunction entered in this case rings hollow given that plaintiffs never bothered to seek any relief for such alleged disobedience.  In casting these aspersions in Mr. Pitsicalis's direction, plaintiffs ignore the fact that this dispute, which extends well beyond the trademarks at issue, was largely resolved prior to trial, for the most part in favor of defendants.  <u>See</u> Order (docket no. 105) (granting partial summary judgment in favor of defendants, dismissing plaintiffs' false designation of origin claim and declaring that defendants are not constrained from trading in images of Jimi Hendrix or from using his name to identify the subject or author of a work).  In light of defendants' overall success in this action, the Court sees no basis for attributing to defendants the sort of bad faith necessary under the Lanham Act to sustain an award of attorney fees in favor of plaintiffs.  The Court DENIES plaintiffs' motion for attorney fees under the Lanham Act.

Under the CPA, a prevailing plaintiff need not prove bad faith, or even actual damages, to be entitled to an award of reasonable attorney fees.  <u>See</u> RCW 19.86.090; <u>see also Mason</u>, 114 Wn.2d at 855-56.  In computing a reasonable amount of fees, the Court is not bound by the lodestar figure, which reflects a reasonable hourly rate multiplied by the number of hours reasonably expended on the matter.  <u>Nordstrom, Inc. v. Tampourlos</u>, 107 Wn.2d 735, 744, 733 P.2d 208 (1987); <u>see also</u> <u>Brand v. Dep't of Labor & Indus.</u>, 139 Wn.2d 659, 666-67, 989 P.2d 1111 (2000) (enumerating various factors, including the level of skill required by the litigation, the undesirability of the case, and the amount of recovery, that may be used to adjust the lodestar amount, and observing that the "central" consideration is "the underlying purpose of the statute authorizing the attorney fees").  Indeed, the Court is charged with making "an independent decision" as to what represents a reasonable amount of

attorney fees, and an attorney's billing records, while relevant, are "in no way dispositive." *Nordstrom*, 107 Wn.2d at 744.

To determine the number of hours reasonably expended on a claim for which attorney fees are authorized, the Court must segregate time spent on unsuccessful motions and on other claims. *See* *Travis v. Wash. Horse Breeders Ass'n, Inc.*, 111 Wn.2d 396, 410-411, 759 P.2d 418 (1988); *see also* *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 672-73, 880 P.2d 988 (1994). Plaintiffs have utterly failed to assist the Court in this endeavor. For example, although defendants prevailed on their motion to exclude plaintiffs' expert Robert F. Cissel and significant portions of the anticipated testimony of plaintiffs' expert Richard F. Yalch, Ph.D., *see* Minute Order (docket no. 116), plaintiffs seek all fees connected with preparing their response to defendants' motion in limine. Plaintiffs also request fees related to their unsuccessful motion to preclude testimony concerning their lack of "publicity" or "personality" rights, *see id.*, and their failed attempt to secure a summary judgment on their CPA claim, *see* Order at 2-4 (docket no. 102) (rejecting plaintiffs' assertion that trademark infringement constitutes a per se violation of the CPA). The Court will not award attorney fees for motions on which plaintiffs did not prevail.

Moreover, although the CPA claim was only one of six causes of action asserted by plaintiffs in their Amended Complaint, plaintiffs suggest that they are entitled to all fees associated with the preparation of such pleading. One of plaintiffs' claims, however, for false designation of origin, was dismissed with prejudice by the Court on defendants' motion for summary judgment, and three of plaintiffs' causes of action, for contributory infringement, unjust enrichment, and constructive trust were abandoned by plaintiffs before trial commenced. *See* Order at 44-47 (docket no. 105); Minutes (docket no. 125); Pretrial Order at 4 (docket no. 126). The Court will not grant fees for alleging claims later dismissed on the merits or voluntarily withdrawn.

The Court also declines to award fees in connection with plaintiffs' motion for preliminary injunction, which was premised entirely on the trademark infringement allegations.  With respect to discovery and trial, plaintiffs' contention that their trademark infringement and CPA claims were so intertwined that the time spent on each theory cannot be apportioned has no merit.  *See* *Travis*, 111 Wn.2d at 411; *see also* *Hume*, 124 Wn.2d at 673.  Liability on the trademark infringement claim was established almost a year before trial began.  From that point forward, as to the infringement claim, plaintiffs' attorneys' preparation for and activities during trial could only have been focused on damages.  The only damages properly awarded by the jury were defendants' profits attributable to infringement, an amount recoverable pursuant to the Lanham Act, but not under the CPA.  Thus, for the year preceding and throughout trial, none of plaintiffs' attorneys' efforts concerning the trademark infringement claim overlapped with work essential to the CPA claim, and the Court will segregate the time accordingly in calculating fees.

Plaintiffs seek over $500,000 in attorney fees.  Defendants observe that the efforts of plaintiffs' attorneys directed toward the CPA claim represented, at most, only 10% of the time devoted to this case.  Response at 8 n.6 (docket no. 154).  In their reply, plaintiffs offer no contrary or different estimate.  The Court has thoroughly reviewed the billing records submitted by plaintiffs, and concludes that an award of roughly 10% of the attorney fees requested, *i.e.*, $50,000,[14] is reasonable in light of the nature of the CPA claim, the course of

---

[14] Such amount adequately credits plaintiffs' attorneys for the time they spent on the motion for summary judgment on the infringement claim, on which plaintiffs prevailed and which might have streamlined the trial of the CPA claim, and on researching the CPA claim itself.  The award also compensates for what the Court considers a reasonable amount of time devoted to the preparation of jury instructions, given that Washington has pattern instructions for CPA claims and that some of plaintiffs' instructions were contrary to Washington law.  Plaintiffs are also receiving a reasonable amount of fees for crafting both the Pretrial Order and their trial brief, considering the relative simplicity of the CPA claim and the well-settled law on the subject.  The Court has estimated that each of the two trial attorneys and one paralegal expended four days in trial, but has reduced this figure by 50%, which is the proportion that the CPA claim bore to the total claims presented to the jury for consideration.  Finally, the Court has accounted for a reasonable amount of time spent on discovery and trial preparation relating solely to the CPA claim.

ORDER - 17

the proceedings, the minimal results achieved on the CPA claim,[15] and the underlying purpose of the CPA.

### E.     Permanent Injunction

Although the Lanham Act authorizes the Court to grant injunctions, 15 U.S.C. § 1116(a), a plaintiff is not automatically entitled to such relief simply because it has proved its infringement claim. *Westinghouse Elec. Corp. v. Gen'l Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 903 (9th Cir. 1997). The voluntary cessation of the unlawful conduct at issue can moot the dispute, making an injunction inappropriate, provided that the defendant's reform is "irrefutably demonstrated and total." *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986). Even when warranted, an injunction may not be broader than required or burden protected speech. *Quiksilver, Inc. v. Kymsta Corp.*, 360 Fed. Appx. 886, 889 (9th Cir. 2009) ("an injunction must be 'tailored to eliminate only the specific harm alleged'"); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986) (on appeal, modifying an injunction because it "seems to prohibit future comparative advertising even if it is truthful"); *see also TrafficSchool*, 2011 WL 3198226 at *7.

Having reviewed plaintiffs' proposed permanent injunction, docket no. 59-2, and defendants objections thereto, docket no. 63, the Court is persuaded that some provisions of plaintiffs' form are not sufficiently tailored to the violations at issue. In addition, the Court agrees with defendants that they are entitled to inclusion of language clarifying their nominative fair use rights with respect to the names "Jimi Hendrix" and "Hendrix." The Court has made the necessary modifications and will separately enter an appropriate permanent injunction.

---

[15] In light of the Court's ruling that plaintiffs presented insufficient evidence of actual damages, the Court questions whether trial was even necessary in this case. Liability for trademark infringement had been established in advance of trial, and defendants did not, and still do not, contest the amount of their profits attributable to infringement, which is the only portion of the jury verdict that has survived. Thus, plaintiffs did not improve their position by proceeding with trial.

ORDER - 18

**Conclusion**

For the foregoing reasons, the Court ORDERS as follows:

(1)   Defendants' motion for judgment as a matter of law and alternative motion for a new trial, docket no. 152, are GRANTED and CONDITIONALLY GRANTED, respectively;

(2)   Plaintiffs' motion for treble damages, docket no. 147, is DENIED, and plaintiffs' motion for attorney fees, docket no. 147, is DENIED in part and GRANTED in part;

(3)   The Clerk is DIRECTED to enter a separate permanent injunction and a judgment in favor of plaintiffs Experience Hendrix, L.L.C. and Authentic Hendrix, LLC, against defendants HendrixLicensing.com, LTD and Andrew Pitsicalis, in the amount of $60,000, representing defendants' profits attributable to infringement, plus $50,000, constituting reasonable attorney fees awarded under RCW 19.86.090, for a total award of $110,000, together with costs under 28 U.S.C. § 1920, to be taxed in accordance with Local Rule CR 54(d), and interest at the rate allowed under 28 U.S.C. § 1961, to run from the date of judgment until paid in full; and

(4)   The Clerk is further DIRECTED to send a copy of this Order to all counsel of record and to CLOSE this case.

IT IS SO ORDERED.

DATED this 21st day of September, 2011.

/s/ Thomas S. Zilly
Thomas S. Zilly
United States District Judge